THE EVANGELICAL LUTHERAN SYNOD of Missouri, Ohio and Other States, a Corporation, and CONCORDIA PUBLISHING HOUSE, a Corporation, Appellants, v. ARTHUR C. HOEHN, as Assessor of the CITY OF ST. LOUIS (EUGENE M. GUISE Substituted as Party Defendant as Successor in Office to ARTHUR C. HOEHN); LOUIS NOLTE, as Comptroller of the CITY OF ST. LOUIS, and RICHARD GRUNER, as Collector of the CITY OF ST. LOUIS.—No. 39744.—196 S. W. (2d) 134.

Division Two, August 1, 1946.

Motion for Rehearing or to Transfer to Banc Overruled, September 9, 1946.

258

*Louis A. McKeown* for appellants.

*George L. Stemmler, James V. Frank* and *Charles J. Dolan* for respondents.

ELLISON, P. J.—This is an appeal from a judgment of the circuit court of the City of St. Louis in favor of the defendants-respondents and against the plaintiffs-appellants, in a suit brought by the latter in November, 1944, seeking an adjudication that their real estate in that city was exempt from 1944 city taxes under Sec. 6, Art. X of the Constitution of Missouri, 1875, and Sec. 10937 of the statutes,[1] on the ground that the real estate was and is exclusively used for religious worship and purposes purely charitable; and praying a mandatory injunction requiring the expungement of the city record showing the assessment of those taxes, and a perpetual injunction enjoining their certification and collection.

The plaintiffs-appellants are the Evangelican Lutheran Synod of Missouri, Ohio and Other States, and Concordia Publishing House. Both are Missouri corporations organized under Art. 10, Chap. 33, Sec's 5436-5465 covering benevolent, religious, educational and other like corporations. For convenience we shall refer throughout this opinion to the first named corporation as the Synod, and to the second as the Publishing House. The defendants-respondents are the Assessor, the Comptroller and the Collector of Revenue of the City of St. Louis.

The Publishing House is a subsidiary corporation of the Synod, the latter controlling, through the board of directors elected by it, all the activities of the former. It is conceded that in their activities the two corporations constitute a single unit. The Publishing House does a specialized printing and publishing business, and holds title to the real estate involved for the use and benefit of the Synod. For record purposes it should be stated the real estate consists of eighteen lots described as: Lots 1 to 12, inclusive, the south 15 feet of Lot 21, and all of Lots 22, 23 and 24, all in block 1 of Henry T. Blow's Subdivision; also Lots 11 and 12 in block 1 of Belt and Priest's Subdivision; all in City Block 1562 of the City of St. Louis.

The aforesaid lots 1 to 12 in the Blow subdivision and lots 11 and 12 in the Belt and Priest subdivision all lie together, making 14 lots facing west on Jefferson Avenue with a total frontage of 345 feet 1-¼ inches, and a depth of 122 feet 6 inches facing south on Miami Street. On these lots are four abutting brick buildings. The first three are three stories high, and the fourth is one story high. Though built at different times they constitute one unit. Across a fifteen foot

---

[1]All references are to R. S. Mo. 1939, and Mo., R. S. A. same section number, unless otherwise indicated. Italics and parentheses in quotation are ours unless otherwise stated.

alley to the east are lots 24, 23, 22 and the south 15 feet of lot 21 in the Blow subdivision, facing east on Indiana Avenue with a total frontage of 85 feet 5-½ inches, and a depth of 122.5 feet facing south on Miami Street. On the south 70 feet 5-½ inches of these four lots are two abutting brick buildings, the former being three stories high and the latter one story. These two buildings constitute another unit. The north 15 feet of these lots is vacant.

All the buildings are used solely for the purposes of the two corporations. They contain various offices of the Synod, the Publishing House and church organizations; a book library and a sacred music library, used by the clergy, teachers and musicians; a large auditorium used by the Synod; a large book display room where books may be purchased at retail; a printing plant, and bindery; stock room; storage and warehouse rooms; engine, boiler and heating plant rooms. All the lots were purchased and the improvements thereon constructed solely out of the profits and surplus of the Publishing House.

Part of the books sold by the Publishing House are printed and published by it, and part by others. Most of them are religious books. Some are secular, mainly English Classics and Webster's Dictionary, all these being approved by the Synod. It also prints religious periodicals and supplies material to the denominational churches and parochial schools. The Synod's Regulation No. 10 governing publications by the Publishing House, provides: ''The Board (of Directors) shall fix the price of books in accordance with the market and in general, through the General Manager, direct the sale of books and periodicals in a businesslike way.'' Sundry Regulation No. 1 provides ''large and small Bibles'' (in the German language) shall be sold at cost. And Sundry Regulation No. 2 admonishes that anyone who does not pay his debts after repeated admonitions shall be refused further credit. Without question, the business of the Publishing House is conducted *like* a business, but its profits have been used for the extension of its properties, or paid to or held for the Synod. In 1944 there were 2,320,860 cubic feet in all the buildings, of which it appears about 90% were used by the Publishing House.

The gross sales of secular books in 1944 amounted to $9,477.98 which was only .6% of the gross receipts of the Publishing House that year, the latter being $1,560,741.54. The net assets were $1,332,290.30, and the net income was $225,889.89, being a 17% return on those assets. There is, of course, no capital stock. Of the net income of the Publishing House $125,000 was turned over to the Synod in 1944. But the budget receipts of the Synod that same year were $2,580,628.64, of which over 83% was paid out for foreign and home missions, colleges and seminaries, pensions, etc. Practically all this except the aforesaid $125,000 came from budget contributions from 5,271 congregations of the denomination in the United States, Canada and South America, and from endowments, interest earnings, etc.

The aforesaid net income of the Publishing House in 1944 was 8.75% of the total receipts of the Synod. Neither the Synod nor the Publishing House is operated for the financial profit or benefit of any of its members. Salaries or wages are paid to officers and employees, but it is not contended these are so great as to constitute concealed profits.

The 5,271 congregations of the Evangelical Lutheran Church, which stresses evangelism, are the base of the pyramidal structure of the denomination. The Synod is their nerve center and the co-ordinator of their activities. The Publishing House furnishes books, periodicals and supplies and contributes substantially in a financial way, as shown above. Some colleges, seminaries and parochial schools are maintained. The Synod originally was a voluntary association formed in 1847. It was incorporated in 1894 by pro forma decree in St. Louis under the then statutes which are now numbered as cited in the beginning. Sec. 5436 authorizes the incorporation of associations for religious purposes, and Sec. 5439 covers church organizations formed for religious purposes and purely charitable societies. The decree simply granted a charter under the whole Article without specifying whether the corporation was religious or purely charitable.

Article II of the Synod's amended Articles of Association, on "Membership and Objects," provided: "The object of this Association shall be to unite in a corporate body the members of the Evangelical Lutheran Church who remain true to, and acknowledge as a true exhibition of sound Christian doctrine, the Book of Concord of the year of our Lord Fifteen Hundred and Eighty; to receive, acquire, hold, manage, and control the real and personal property and franchises which may hereafter be acquired by this Corporation and such as have heretofore been obtained and are now held by different educational corporations under its direction and for its advancement, and to continue and perpetuate the good work of disseminating the Gospel throughout the world, and that the Association may engage in all phases of radio broadcasting."

The educational corporations mentioned in this Article, whose property was to be taken over, are described in the Preamble as "conducting colleges, seminaries, and other institutions of learning in order thereby to aid in the disseminating of a knowledge of the Word of God and in the educating of ministers and teachers to labor in the Lutheran Church." Article VI of the Articles named these corporations by their corporate names, and also the colleges and seminaries, which they conduct. They were: Concordia College, in Missouri; German Theological Seminary, in Indiana; Evangelical Lutheran Teacher's Seminary, in Illinois; and Concordia College, in Wisconsin.

The "Regulations" of the Synod governing the Publishing House repeat substantially certain provisions of the by-laws of the latter

with respect to the selection of its directors [set out in the third paragraph below]. Then Sec. 2 of the Regulations provides: "The Board (of directors of the Publishing House) shall in the name of the Synod, *to which it shall in all things be responsible and accountable, and solely for its benefit*"—do enumerated things. Sec. 6 provides: "The Board and all its members are, in accordance with Sec. 11 of the Synodical Constitution, *employees of the Synod* and shall therefore, like other officials of the Synod, *be subject to its authority.*" Sec. 7 provides: "Unless the Synod itself has decided what shall be printed and put on the market, the Board alone shall be empowered to do this."

The Publishing House was first organized in 1921 as a business corporation. Upon the expiration of that charter in 1941 the present corporation was created by pro forma decree under the foregoing statutes, without specifying whether the corporation is religious or charitable. Article V of the Articles of Agreement of the Publishing House recites its purposes as follows:

"This Association is formed to promote religious education among members of the churches, Sunday schools, and parochial schools of the said Synod, and for the advancement and extension of knowledge and learning among people generally. In furtherance of the purposes hereinabove mentioned, this association may publish or cause to be published and distribute or cause to be distributed, by sale, gift, or otherwise, Bibles, church books, schoolbooks, religious periodicals, and other books and literature as may from time to time be expedient and proper; and may acquire and publish among other things (certain named) religious periodicals (then) published . . . by the said Synod, and such Bibles, church books, schoolbooks, religious periodicals, and other books and literature as may have been from time to time printed and published by the said Synod and other religious and charitable organizations. For said purposes this association may purchase or otherwise acquire, own, and operate the necessary printing plants and establishments, and may purchase, own, lease, or otherwise acquire and sell such real and personal property as may be necessary or expedient for said purposes."

Article III of the Articles of Agreement of the Publishing House provides the directors thereof "shall hold their office for such time and in such manner and *under such terms and conditions as may be set forth by the*" Synod. Article I of the By-Laws of the Publishing House provides that one of the seven directors thereof "shall be an ordained minister of the Gospel, one a parochial school teacher, and the remaining five (5) practical businessmen. All such directors shall be members of the (Synod), and in good standing." They are required to be elected at the regular triennial Conventions of the Synod, not by any independent membership of the Publishing House. In fact there is none.. Vacancies on the Board between elections are

filled by the remaining members of the Board with the consent of the President of the Synod.

So much for the facts. Appellants maintain they both are charitable corporations. Seemingly, they also concede the Synod is a religious corporation. How they account for the Synod's dual status as a charitable *and* a religious corporation will be explained later. At any rate they contend their said real estate, the title to which is held by the Publishing House for the Synod, was tax exempt in 1944 under the second sentence of Sec. 6, Art. X, Const. Mo. 1875, supra, which provided, so far as applicable here: "Lots in incorporated cities or towns, . . . to the extent of one acre, . . . with the buildings thereon, *may* be exempted from taxation, when the same are used exclusively for religious worship, for schools, or for purposes purely charitable . . ." The sixth clause of Sec. 10937 of our statutes enacted this permissive exemption into law by adopting the language of the constitutional provision and substituting the word "shall" for "may."

 We agree that the Synod is a religious corporation. Its Articles of Association set out in the fourth and fifth preceding paragraphs say almost in so many words that its object and purpose is to spread the gospel of the Evangelical Lutheran Church. It was held in the Westminster College case,[2] that a corporation established for purely academic purposes and general education in literature and the arts and sciences is in no sense a religious corporation, although under the care and management of a (Presbyterian) religious denomation. And so, conversely, if the Synod is a religious corporation then it cannot be a purely charitable corporation. And if it is a religious corporation it cannot hold title to the lots and buildings involved under another section of the Constitution of 1875 mentioned in the fourth paragraph below.

In the Proctor case,[3] this court said of the two corporations, one of which was incorporated in Tennessee to hold real estate and other property in trust for the Methodist Episcopal Church, South, and the other in Missouri to conduct a training school for missionaries and other Christian workers under the control, maintenance and auspices of a Board of Foreign Missions, of the same denomination—this court said of those two corporations (italics ours): "Neither one of them was organized or established for purely academic purposes, or to impart general education, literature, or the arts and sciences. If they had been they would *not* be in the constitutional sense religious corporations." The Proctor case further adopted the following language from In re St. Louis Institute of Christian Science, 27 Mo. App. 633,

---

[2]State ex rel. Morris v. Board of Trustees of Westminster College (1903), 175 Mo. 52, 56-7, 74 S. W. 990(1).

[3]Proctor v. Board of Trustees of Methodist Episcopal Church, South, (1909), 225 Mo. 51, 64(3), 123 S. W. 862, 865(3), 30 L. R. A. (N. S.) 1.

640, concerning the corporati⦁ ⦁ there under adjudication: "Take away the religious agency, and ⦁here is literally nothing left, whereby the corporation may effect its purposes."

Likewise the Society of the Helpers case,[4] declared (quoting substantially, italics are the court's) that imparting religious instruction by the inculcation of a particular faith through the teaching of its tenets, is not an object for which a *legal* corporation may be exclusively formed under the Constitution of this State (to hold title to real estate for general purposes). In that case, however, since another objective of the Society was the performance of daily duties in visiting and assisting the sick poor "irrespective of creed or color", and since it was thought the charter indicated religious instruction was only an incidental part of the Society's activities, the court ruled the Society could qualify as a benevolent or charitable corporation. But there was a dissent on the latter ruling.

And finally in the Stillman Institute case,[5] that institution being an incorporated successor with general educational scope, of Tuscaloosa Institute, which latter had been engaged only in educating young colored men for the ministry in the Presbyterian Church, this court said: "Had the Tuscaloosa Institute incorporated solely for the purpose of continuing the work in which it was then engaged, that of educating young colored men for ministry, it would no doubt be a religious corporation within the purview of Sec. 8, Art. II of the Constitution of Missouri."

As indicated by the Society of the Helpers and Stillman decisions, the question whether the Synod is a religious or a charitable corporation is important, because Sec. 8, Art. II, Const. Mo. 1875 provided: "That no religious corporation can be established in this State, except such as may be created under a general law for the purpose only of holding the title to such real estate as may be prescribed by law for *church edifices, parsonages and cemeteries.*" A printing and publishing business is not one of those three uses, and if the Synod is a religious corporation and claimed in 1944 to be the real holder of the title to the lots and buildings here involved for a publishing house, it could not do so under the ▮ Constitution of 1875. The above section was omitted from the new Constitution of 1945, but was in force in 1944 and prior thereto when the instant taxes were levied and became due.

▮ And if the appellants could not hold title to the lots and buildings they could not claim tax exemption thereon. That was the precise issue in the Westminster College case, supra. It was a suit for taxes where tax exemption was claimed by the College as an educational corporation. The tax collector contended it was not an

---

[4]Society of the Helpers of the Holy Souls v. Law (1916), 267 Mo. 667, 676(2), 186 S. W. 718, 725(1, 2).
[5]Wyatt v. Stillman Institute (1923), 303 Mo. 94, 104, 260 S. W. 73, 76(5).

educational but a religious corporation; and that such corporations were proscribed by Sec. 5, Art. 13, Const. Mo. 1820, which was in force when the College was chartered. This court said the issue was well pleaded and decided it on its merits, ruling the College was not a religious corporation.

The general rule is that on grounds of sovereignty and public policy the legal existence of a corporation cannot be attacked collaterally by private suitors, but only in a direct proceeding instituted by the State.[6] But that doctrine is not applicable here.[7] The respondents do not deny that appellants are legal corporations. The issue, as in the Westminster case, supra, is on *what kind* of corporations they are, and whether in their true character they could in 1944 hold title to the real estate involved free from taxes. The Proctor, Society of the Helpers and Wyatt cases, supra, did not involve tax exemptions, but all were land title suits wherein the basic issue was whether certain benevolent corporations did and could take title to real estate, this depending on whether they should be classed as religious or charitable corporations. It was expressly ruled in the Proctor case that the attack was not collateral [225 Mo. 1. c. 68, 123 S. W. 1. c. 867(6)].

And this further may be said. The City of St. Louis, appearing here through its respondent officers and acting in a governmental capacity, is defending its right to collect taxes on the appellants' real estate. And it could hardly be a sound public policy that would forbid the exercise of that right unless and until the State had first determined in court the appellants' status as corporations. It was ruled in State to Use of City of Memphis v. Planters Fire and Marine Ins. Co., 95 Tenn. 203, 31 S. W. 992, that while the tax claimant in such instances cannot attack collaterally the corporate existence of a taxpayer, yet it can challenge the *immunities* invoked. We think the city undoubtedly has that right here.

Now getting back to appellants' contention that the Synod is *both* a religious corporation and a charitable corporation. They rely on a definition[8] of a charity recently approved in this State in Salvation Army v. Hoehn, 354 Mo. 107(3), 188 S. W. (2d) 826, 830(5),

[6]14 C. J., p. 204, sec. 216; 18 C. J. S., p. 489, sec. 94; 13 Am. Jur., p. 203, sec. 60.

[7]14 C. J., p. 211, sec. 218; 18 C. J. S., p. 493, sec. 95-b; 13 Am. Jur., p. 205, sec. 60; Rock Hill Tennis Club v. Volker, 331 Mo. 947, 962-3(5, 6), 56 S. W. (2d) 9, 15(2).

[8]This definition was first formulated in 1867 by (later) Mr. Justice Gray in Jackson v. Phillips, 96 Mass. 539, 556, in a suit by an executor for instructions as to the validity of a testamentary money bequest for the benefit of negro slaves generally. The opinion treated the bequest as a "public or charitable trust", apparently using the two adjectives synonomously, and gave the above definition of a charity by gift "in the legal sense." It has been so cited in encyclopedic texts since: 5 R. C. L., p. 295, sec. 2; 10 Am. Jur., p. 585, sec. 3; 11 C. J., p. 299, sec. 1; 14 C. J. S., p. 410, sec. 1. It was used as a definition of a *public* charity in Catron v. Scarritt Collegiate Institute, 264 Mo. 713, 725, 175 S. W. 571, 573(4); Robinson v. Crutcher,

as follows: ''A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.''

Appellants reason that since this definition makes a gift for religious purposes a charity, therefore a religious corporation may be also a charitable corporation within the meaning of Sec. 6, Art. X, Const. 1875, and Sec's 5436 and 5439 of our statutes, which treat of both together. This permits of the conclusion that although the Synod as a *religious* corporation cannot own the lots and buildings involved for a printing and publishing plant because that would violate Sec. 8, Art. II, Const. 1875, yet it can do so in its character as a *charitable* corporation, since that does not violate Sec. 6, Art. X of the same Constitution. And it is true that the decrees of incorporation of both appellants are broad enough to cover any kind of a benevolent corporation. But this theory cannot stand. Sec. 8, Art. II mentioned religious corporations alone; and Sec. 6, Art. X, with reference to tax exemptions, particularized and mentioned the two kinds of corporations separately and not as one class. The Synod must be classified by what its Articles of Association say, by appellants' concessions, and by what it was doing.

 On the other hand, it is true the Articles of Association of the Publishing House show its objectives are not exclusively religious. Article 5 thereof, set out above, first states its purpose is ''to promote religious education among members of the churches, Sunday schools, and parochial schools of the said Synod.'' That, as we have seen, is a religious objective.[9] But it continues, ''and for the advancement and extension of knowledge and learning among the people generally.'' Then follow provisions authorizing the publication and sale of religious and other books and literature to the public and the acquisition and operation of printing plants and the ownership of land for those purposes.

Conceding tentatively that these latter provisions in the Articles of Association of the Publishing House make it, standing alone, a

277 Mo. 1, 8, 209 S. W. 104, 105(1); and In re Rahn, 316 Mo. 492, 511, 291 S. W. 120, 128, 5 A. L. R. 877. But the Salvation Army case, cited above in this opinion, held ''a charity is a charity,'' and applied the definition generally. There are several distinctions between public and private charities, 11 C. J., p. 301, sec. 6; 14 C. J. S., p. 415, sec. 1-f. But as noted in these works, both classes of charities have been defined in the same terms: 11 C. J., p. 300, sec. 1, note 4; and 14 C. J. S., p. 415, sec. 1-e.

[9] As to parochial schools see Harfst v. Hoegen, 349 Mo. 808, 163 S. W. (2d) 609, 141 A. L. R. 1136.

charitable rather than a religious corporation; and remembering that a charitable corporation is not restricted by Sec. 8, Art. II, Const. 1875, to the ownership of land for particular purposes as are religious corporations; this further question arises. Could the Synod, a religious corporation, by creating the Publishing House as a subsidiary corporation to hold title to its land not used for church edifices, parsonages and cemeteries, evade the provisions of that constitutional provision, which forbade the Synod to hold title to such land?

We think that question should be answered in the negative in view of the Articles of Agreement, By-Laws and Regulations of the two corporations, and especially in view of appellants' contention that they should be treated as a single entity or unit.[10] Undoubtedly, the primary objective of the whole unit is religious. The "Regulations" of the Synod declare the board of directors of the Publishing House are *its* employees, subject to its authority, and in all things responsible and accountable to it. And it has been said "the prohibition of a statute limiting the amount of real estate which can be held by a religious corporation cannot be evaded by placing the property of the corporation in the hands of trustees."[11] Whether or not the Publishing House here technically is a trustee would make no difference. The ▮▮▮ trust, or power, or agency, whatever it be, is in the nature of a dry trust and the Publishing House holds only the naked legal title. And we are unable to see how we can treat the two corporations as one religious unit in order to justify the profits made by the Publishing House, and then grant it a severance so that it can escape the restrictions of Sec. 8, Art. II, supra.

▮ However, we shall not let our decision rests solely on the conclusion just reached, based on Sec. 8, Art. II, Const. 1875. For it is directed to the Synod's right to *own* the lots and buildings, whereas the *use* made of them is the criterion established by Sec. 6, Art. X, Const. 1875 and Sec. 10937, governing tax exemptions (though the two sections must be construed together). The general rule in such instances is that the use made of the property controls, rather than the charitable character of the owner.[12] And the briefs on both sides are written mainly on that theory. Appellants contend that since the Publishing House turns over to the Synod the entire profits from its

---

[10]This contention is made by appellants to justify the considerable profits earned by the Publishing House, on the theory that they are devoted to the religious objectives of the Synod.

[11]45 Am. Jur., p. 761, sec. 49, citing Church of Jesus Christ of L. D. S. v. U. S., 136 U. S. 1, 47, 34 L. Ed. 478, 492, 10 S. Ct. 792, 804, where the Mormon Church had acquired real estate and vested the title in trustees contrary to an Act of Congress passed in 1862 prohibiting any religious corporation in any Territory from acquiring or holding real estate of a greater value than $50,000.

[12]51 Am. Jur., p. 584, sec. 601; p. 587, sec. 605; 61 C. J., p. 452, sec. 500; p. 458, sec. 513. Annotations: 34 A. L. R., p. 659; 62 A. L. R., p. 334; 108 A. L. R., p. 292.

printing and publishing business in aid of religion, therefore the use of the lots and buildings for those purposes is a charitable or religious use not contravening Sec. 6, Art. X, supra.

But it must be recalled that in the past exalted appeals, such as are made here now, resulted in the concentration of large amounts of property in the Church, and the consequent enactment of restrictive laws and constitutional provisions to prevent it. Our Constitution of 1820, Sec. 5, Art. 13, prohibited the establishment of religious corporations altogether. The Constitution of 1865 was only a little more liberal. The very facts that the part of Sec. 6, Art. X, Const. 1875 involved here declared the use of tax exempt real estate should be "exclusively for religious worship" or for "purposes purely charitable," coupled with the further limitation of such permissive exemptions to one acre in cities and towns and five acres in the country—those facts show the right was granted cautiously, with the intention of confining it within narrow bounds.

The prerequisites to tax exemption were: (1) the *use* of the land itself, not merely its usufruct, for those exclusive purposes; (2) the owner must be dedicated to those purposes. To that extent the ownership characterized the use. If the first were not true, a proper religious or charitable institution could have claimed tax exemption if, for instance, its real estate was merely rented out and the rentals devoted to its objectives—which is not the law.[13] And if the second were not true *any* business could have made its real estate tax exempt (within the Constitutional area, of course) by consecrating the returns therefrom to religious or charitable uses. Furthermore, the doctrine is practically universal that religious or charitable institutions cannot enter the field of business and operate for profit.[14] Sec. 5444 covering benevolent corporations has provided ever since 1879 that no association formed "for business purposes of any kind, or for pecuniary profit in any form" shall be incorporated thereunder.

But there are, and always will be, borderline cases. The rule in this State is that the plotted objective of the institution must be exclusively religious or purely charitable; and its activities must be such as integrate with its objective—that is, fit in without changing its character. Some states inquire merely into the *dominant* (apparently in the sense of predominant) objective and figure the percentage of different objectives or activities. But our most recent expression of the rule under the 1875 Constitution is in the Y. W. C. A.-Baumann case[13] and the Salvation Army case,[8] where it is said the

[13] 51 Am. Jur., p. 588, sec. 608; 61 C. J., p. 461, sec. 518; Y. W. C. A. v. Baumann, 344 Mo. 898, 904, 130 S. W. (2d) 499, 502; State ex rel. Koeln v. Y. M. C. A., 259 Mo. 233, 237, 168 S. W. 589, 590; Fitterer v. Crawford, 157 Mo. 51, 57 S. W. 532, 50 L. R. A. 191.

[14] 45 Am. Jur., p. 784, sec. 74; 61 C. J., p. 485, sec. 567; Annotations, 100 A. L. R., p. 579; 51 Am. Jur., p. 587, sec. 605; 61 C. J., p. 461, sec. 517; Annotations: 34 A. L. R., p. 659; 62 A. L. R., p. 334; 108 A. L. R., p. 292.

270

activities must accord with the *primary* objective and round it out or dovetail into it—though slight, temporary, or in a word immaterial, deviations will not be fatal. Appellants cite authority[15] holding the receipt of income by charitable hospitals from patients able to pay will not deprive them of land tax exemption, if their services are equally available to those who cannot pay and if the income is used in furtherance of their charitable purposes. But those cases are not in point because the income there is not profit and is derived from services precisely in line with their chartered objective.

The Y. W. C. A. and Salvation Army decisions just cited are the last rendered by this court upholding land tax exemptions to charitable institutions. In both, the objective was admittedly charitable and the issue was whether their activities conformed to that objective. The Y. W. C. A. had a five story building, and the Salvation Army a thirteen story building called the Evangeline Residence—formerly a hotel. Both were in St. Louis and both rendered religious, social and economic assistance helpful to many women in a large urban environment. The Y. W. C. A. had a gymnasium and swimming pool for the use of which a small charge was made, and both institutions furnished lodging and meals to members. These activities were non-competitive and the charges were at cost. In the first three years the Evangeline Residence had operated at a loss of nearly $34,000 and the fourth year recouped enough to reduce the loss to something over $29,000. We think these two decisions were correctly ruled, and that they harmonize with our conclusion in the last paragraph with respect to charitable hospitals.

 But the facts in the instant case are very different. The Publishing House occupied nearly the whole premises involved with its specialized printing and publishing business, which is competitive and run like any other similar business. Over 99% of the books and publications sold in 1944 were religious, measured by money volume of sales. But all were sold to both members and churches of the denomination and to the public, for cash or credit and at regular market prices (except Bibles in the German language). A large display room was maintained for that purpose. The net profit in 1944 was nearly $226,000, which was a 17% return on the $1,332,000 net assets of the Publishing House and 8.75% of the total receipts of the Synod that year. Of the profits $125,000 was turned over to the Synod leaving over $100,000 in its hands. But its money and property were subject to the control and direction of the Synod. All the lots and buildings, the printing plant and supplies, were acquired or built up out of its earnings and surplus.

---

[15] 51 Am. Jur., p. 585, sec. 602; p. 607, sec. 636; 61 C. J., p. 502, sec. 600; State ex rel. Alexian Bros. v. Hospital, 10 Mo. App. 263, 268, ibid, 74 Mo. 476; Nicholas v. Evangelical Deaconess Home, 281 Mo. 182, 191-2, 219 S. W. 643, 646(3).

Prior to 1941 the Publishing House was a statutory business corporation owned wholly by the Synod and doing business as now. That year it was held in Murphy v. Concordia Publishing House, 348 Mo. 753, 155 S. W. (2d) 122, 136 A. L. R. 1461, *not* to be a religious corporation, as against a claim for exemption from our Unemployment Compensation Law. That decision is not controlling here, since the Publishing House then was a business corporation with no chartered religious or charitable powers. Also, the parties and underlying legislation were different. But the case did hold the destination of its income (to the Synod, a religious corporation) was not the determinative factor. That may be treated as a precedential ruling that unless the Publishing House can show it was a religious or charitable corporation in 1944 and was conducted as such, the fact that its earnings were destined to the Synod would not purge its shortcomings.

It seems no Missouri decisions have passed on the status of a publisher of religious literature as a religious or charitable institution entitled to tax exemption. But the subject is covered in an Annotation in 154 A. L. R. 895. The annotation assumes an enterprise of that kind abstractly *can* be a tax exempt religious or charitable institution and inquires into uses made of its property which various decisions hold will put it in or exclude it from that class. We shall refer to a few of these decisions[16] which are also cited by the parties here. In general it should be understood that in each case the owner of the property was a benevolent corporation or body which engaged in the publishing business for profit, and that the profits were used for its benevolent purposes or those of a parent organization.

In the *Tennessee* case the Constitution exempted all property "held and used for purposes purely religious, charitable," etc. The decision held a direct, physical use of the property for charity was unnecessary; and that the destination of the profits was controlling. Neither of these doctrines is the law in this state. In the *Pennsylvania* case the Constitution exempted "institutions of purely public charity," and the institution sold some of its publications in a retail store in its building. Held: the part of its building used for the store was taxable. This accords with the case law in Missouri, except that here where

---

[16]Book Agents of M. E. Church, South, v. Hinton (1893), 92 Tenn. 188, 202-3, 21 S. W. 321, 324-5, 19 L. R. A. 289; American Sunday School Union v. Taylor (1894), 161 Pa. St. 307, 315, 29 Atl. 26, 28, 23 L. R. A. 695, 697-8; Congregational etc. Pub. Soc. v. Bd. of Review (1919), 290 Ill. 108, 117, 125 N. E. 7, 9; United Brethren Pub. Establishment v. Shaffer (1919), 74 Ind. App. 178, 182, 123 N. E. 697, 698; The American Issue Pub. Co. v. Evatt (1940), 137 Oh. St. 264, 28 N. E. (2d) 613, 615; Zindorf v. Otterbein Press (1941), 138 Oh. St. 287, 34 N. E. (2d) 748; Incorporated Trustees of Gospel Workers Society v. Evatt (1942), 140 Oh. St. 185, 42 N. E. (2d) 900; Northwestern Pub. House v. City of Milwaukee (1933), 177 Wis. 401, 188 N. W. 636; Hairenik Assn., Inc., v. Boston (1943), 313 Mass. 274, 279, 47 N. E. (2d) 9, 11-12; Board of Assessors v. Lamson (1944), 316 Mass. 166, 55 N. E. (2d) 215, 154 A. L. R. 886.

part of a unit tract is used for non-charitable purposes the whole is taxable since it is not used *exclusively* for charity (cases in marginal note 13).

In the *Illinois* case the Constitution and enforcing statute exempted property used exclusively for religious or charitable purposes, except such as was "leased or otherwise used with a view to profit." The Society sold some of its publications through its retail store. Its income mainly was from donations. The decision held the controlling issue was whether the primary purpose of the retail book business was charitable, or was the making of a profit with a secondary objective of devoting the profit to charity. It held the former was the "dominant" objective and sustained the exemption on the same theory as in hospital cases. In this state a clear distinction is drawn between a hospital and a competitive business operated for profit, notwithstanding the profits are devoted to charity. This latter theory is followed in the *Indiana* case with respect to a publishing business.

When the three *Ohio* cases were decided the Constitution and statute exempted "property belonging to institutions used exclusively for charitable purposes." In the American Issue case a non-profit corporation was owned by and sold its output to temperance organizations, and used its net income to build up its plant and propagandic facilities. On these meager facts tax exemption was upheld. In the Zindorf case 40% of the corporation's income was from commercial printing and the profits were substantial. Exemption was denied. In the Gospel Worker case the members of the religious organization were fed and housed in dormitories. Their $376,000 publication business netted $55,000, which was devoted to charity. The decision stressed the word "exclusively" in the Ohio Constitution and denied the exemption, declaring "the test is in the present *use* of the property rather than the ultimate use of the proceeds." With reference to the American Issue case, supra, it said that was a "border-line case and is to be confined to the facts of that case."

In the *Wisconsin* case the plaintiff was practically the twin of the Publishing House here, both being subsidiaries of the instant Synod with the same corporate set-up and activities, except that the Wisconsin House also sold church and school furniture and baptismal fonts. The court refused to decide whether the plaintiff and the Synod were tax exempt religious corporations, but held they were in effect merged educational or benevolent corporations; and that the "so-called profits" of the Publishing House were used for those objectives, at least *through* the Synod—in other words, the profits of the Publishing House were only income of the Synod, and were used exclusively for the foregoing purposes, complying with a Wisconsin statute exempting from taxation "personal property owned by any . . . educational or benevolent corporation." The same distinc-

tions may be drawn here as were made in the second preceding paragraph, with respect to the Illinois corporation.

The Hairenik case from *Massachusetts* thus stated the rule. "It is settled that the 'occupation of real estate by an institution which entitles it to exemption of such real estate is occupation directly for the charitable purposes for which it is incorporated and not occupation for profit even if such profit is used for such charitable purposes.' . . . The 'distinction is between activities primarily commercial in character carried on to obtain revenue to be used for charitable purposes . . . and activities carried on to accomplish directly the charitable purposes of the corporation, incidentally yielding revenue.' "

The recent Lamson case from Massachusetts to which the Annotation in 154 A. L. R. is appended, held the personalty in the printing plant of the Christian Science Publishing Society in Boston was tax exempt under a statute so providing with respect to "personal property owned by or held in trust within the commonwealth for religious organizations . . . if the principal or income is used or appropriated for religious, benevolent or charitable purposes." The property was in fact held in trust by the Society in furtherance of the Christian Science religion, and the ultimate income was devoted to those purposes. The main question was whether the printing plant was used for those purposes. The Society published four strictly religious periodicals, and also the Christian Science Monitor, an internationally known daily newspaper which carried a daily religious article, editorially espoused moral virtues, eliminated sordid matter from its news columns, and carried only selected advertising. That newspaper was operated on a commercial basis but actually at a loss.

The decision ruled that in the enactment of the above statute the Legislature had in mind "not an exclusive use but a dominant use of the property" and on that theory sustained the exemption. However, it acknowledged the question would be closer if it had been on the exemption of real estate, under another statute requiring (so far as pertinent here) that it be owned and occupied by charitable institutions for the purposes for which they were incorporated, and not used for other than charitable or religious purposes. In making the above observation concerning real estate exemptions the Lamson opinion cited and distinguished the Hairenik case, supra, written the preceding year by the same judge. It said the tax in that case was assessed on real estate (under a different statute), and that one of the chartered purposes of the corporation there was to engage in a general printing and publishing business.

Appellants also rely on Murdock v. Pennsylvania, 319 U. S. 105, 87 L. Ed. 1292, 63 S. Ct. 870, which held the imposition of a regular peddler's license tax on members of Jehovah's Witnesses who propagandized their religion from house to house by selling religious

literature for a small charge, violated the First and Fourteenth Amendments. The opinion conceded that when a religious body uses ''ordinary commercial methods of sales of articles to raise propaganda funds,'' a license may be charged. But it further said: ''The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books.'' Interpreting the opinion as a whole, we do not understand it to mean a denial of tax exemption is unconstitutional as against persons and organizations engaged in religious work as a business for profit.

Now, getting back to the instant case, one of the chartered objectives of the Publishing House is ''the advancement and extension of knowledge and learning among people generally;'' and it is authorized to publish and sell (for profit) books and literature, and to acquire and operate real estate and publishing plants for that purpose. Any bona fide schoolbook or encyclopedic publishing concern could qualify under that provision. Nor do we think the situation is altered here by the facts that nearly all the sales for profit were of religious literature and made mostly to members of the denomination. Many books are sold competitively and for profit to a limited public, such as law books to lawyers. Appellants' objectives are commendable, and there is no doubt that a charitable trust may operate for profit. But the only question here is whether the land on which appellants' publishing enterprise is conducted is tax exempt; and our Constitution says tax exempt land must be used *exclusively* for religious worship or purposes *purely* charitable. A competitive commercial business operated for profit does not comply with that requirement, even though the profits are devoted to religion.

 Another fact not mentioned in the briefs would have stood in the way of a judgment for appellants. The area of the lots is 52,744 square feet. There are 43,560 square feet in an acre. The lots therefore exceeded the constitutional area limit of the 1875 Constitution by more than 9,000 square feet.

For the reasons stated, the judgment is affirmed. All concur.