**MISSOURI UNITED METHODIST RE-
TIREMENT HOMES, a corpo-
ration, Appellant,**

v.

**The STATE TAX COMMISSION of Missouri
et al., Respondents.**

No. 58659.

Supreme Court of Missouri,
Division No. 2.

May 12, 1975.

Meredith B. Turner, Turner, Reid & Duncan, Springfield, for appellant, Missouri United Methodist Retirement Homes, a Corporation.

Samuel C. Jones, Mt. Vernon, for respondents, The State Tax Commission of Missouri, Lewis A. Carlson, County Collector of Lawrence County, Missouri, County Court of Lawrence County, Missouri, and Earl Snyder, Assessor of Lawrence County, Missouri.

Robert S. Wiley, Crane, for respondents, the City of Marionville, Missouri, and Pat Walker, City Collector of Marionville, Missouri.

STOCKARD, Commissioner.

This appeal involves the denial by the State Tax Commission of an exemption of ad valorem taxes on certain property owned and operated by plaintiff for the care of elderly persons. The construction of the revenue laws of this State is required, and therefore appellate jurisdiction is in this court. We reverse and remand with directions.

We must first dispose of a motion to dismiss this appeal filed by some of the defendants-respondents on the basis that the appeal is premature.

Plaintiff is a Not-For-Profit Corporation chartered in November 1970 under the provisions of § 355.020. (All statutory references are to RCMo 1969, V.A.M.S.). It operates a residential and retirement fa-

cility for elderly persons known as the Ozark Methodist Manor at Marionville, Lawrence County Missouri (hereafter referred to as the "Manor"). Prior to 1972 the Manor's property had at all times been deemed exempt from ad valorem taxes for state, county and local purposes.

In 1972 the Lawrence County Assessor valued a portion of the Manor's property at $100,000. Plaintiff appealed the assessment to the county board of equalization, which refused to alter it, and on August 15, 1972, advised plaintiff that the assessed valuation of $100,000 for 1972 was "to be divided in proportion on the 43 units or cottages" located at the Manor. Plaintiff then petitioned the State Tax Commission (hereafter referred to as the "Commission") for review of the assessment on the ground, among others, that the realty assessed was used for purposes purely charitable within the meaning of § 6, Art. X, Const. of Mo., V.A.M.S., and § 137.100 Par. (5). A hearing was held before the Commission, a record was made, and by letter dated December 1, 1972, the Commission upheld the assessment. On December 29, 1972, plaintiff commenced this action in the Circuit Court of Lawrence County, although no findings of fact or conclusions of law had been made by the Commission, on the theory that unless the petition was then filed the 30–day limitation set forth in Rule 100.04, V.A.M.R., would apply and preclude a subsequent petition for review.

Plaintiff's petition was in three counts, whereby it sought (1) a review of the decision of the Commission pursuant to Rule 100.07; (2) a declaratory judgment that the Manor is exempt from ad valorem taxation for state, county and local purposes because it is operated for purposes purely charitable within the meaning of § 6, Art. X, Const. of Mo. and § 137.100, Par. (5); and (3) recovery of real property taxes paid under protest as provided by § 139.031, as amended. On February 13, 1973, plaintiff moved the trial court to compel the Commission to file the transcript including findings of fact and conclusions of

law, and these were filed on March 14, 1973. Thereafter, plaintiff filed an amended petition for review of the decision of the Commission, the amended petition being in three counts, and in each plaintiff sought the same relief as in the prior petition. Plaintiff then requested a separate trial of Count I. After trial and on November 13, 1973, the circuit court entered its judgment affirming the order of the Commission. It further ruled that Counts II and III were predicated upon plaintiff's right to relief on Count I, and they were "dismissed and stricken."

Plaintiff timely filed a motion to (a) "open or set aside the judgment," (b) to amend said judgment, (c) to direct the entry of a new judgment in favor of plaintiff, or (d) in the alternative, to grant plaintiff a new trial. In this post-trial motion plaintiff set forth the circumstances whereby the decision of the Commission dated December 1, 1972, did not contain and was not accompanied with findings of fact and conclusions of law, and it was alleged that the procedure followed by the Commission resulted in the proceedings being "arbitrary, capricious, unfair, and contrary to the law of the State of Missouri, and should thereby be set aside." On December 26, 1973, the trial court entered an order remanding the "cause * * * to the Missouri Tax Commission for further proceedings," and directed that the Commission "consider all relevant factors in the record bearing on the right of the * * * Commission to assess taxes against the plaintiff's property in question, and make proper findings of fact and conclusions of law to support its decision in accordance with the requirements of the Model State Administrative Act and Stephen and Stephen Properties, Inc. v. State Tax Commission," 499 S.W.2d 798 (Mo. 1973).

In the Stephen case, this court reversed the judgment of the circuit court which had affirmed a decision of the Commission because certain necessary factors had not been considered by the Commission in ar-

riving at the value of the property. This court then commented that § 536.090 provides that " 'Every decision * * * *shall include or be accompanied by* findings of fact and conclusions of law,' " and that the findings of fact and conclusions of law were not timely made and did not comply with the statute. The court noted that the trial court had quashed the untimely findings of fact and conclusions of law, but had affirmed the decision of the Commission, and that "having quashed the Commission's findings, the circuit court [had] no basis to support its affirmation of the commission order."

■ In this case, as in the Stephen case, the findings of fact and conclusions of law were not filed with the decision of the Commission. In fact, in order to be within the period of limitation to appeal plaintiff had to file its petition for review before it knew the factual basis of the Commission's decision. However, after the transcript was filed, and the Commission's findings of fact and conclusions of law were received, plaintiff amended its petition for review, presumably to meet any new issue presented by the findings and conclusions. Also, in this case there was no motion to quash the findings of fact and conclusions of law, and they were not quashed but were considered by the circuit court. Under these circumstances, although the Commission did not follow the clear mandate of the statute, no prejudice (other than delay) resulted to plaintiff. In preparing its amended petition for judicial review, it had the benefit of the Commission's findings of fact and conclusions of law.

The effect of the judgments of November 13, 1973, and December 26, 1973, is that Counts II and III are dismissed, and Count I (the petition for review of the order of the Commission), has been held in abeyance while the "cause" has been remanded to the Commission for it to again consider the case and file its decision containing, or accompanied by, its findings of fact and conclusions of law. The Commission has advised plaintiff that in the recon-

sideration of the matter "A new hearing will be scheduled only if new facts have arisen which have a bearing on the case and could not have been presented to the Commission at the original hearing." None of the parties has indicated that any such new facts are to be presented.

The parties have briefed this case to this court on its merits, and as previously pointed out, no material prejudice to any party resulted from the failure of the Commission to file timely its findings of fact and conclusions of law. Also, it would be a useless and time consuming act for the Commission now to rewrite its "Decision" and attach to it a copy of the findings and conclusions previously made and file them with the Circuit Court of Lawrence County, and for the parties to again present their case to the circuit court. Under the unusual circumstances of this case, and in the exercise of our discretion, we overrule the motions to dismiss the appeal, and we shall rule the case on its merits as though it is an appeal by the plaintiff from the judgment on November 13, 1973, which affirmed the order of the Commission.

Plaintiff was first organized as a Not-For-Profit corporation under the laws of Missouri in 1950 for the purpose of establishing and maintaining a home for aged persons under the auspices of The United Methodist Church of Missouri. Prior thereto, the Manor was an operation referred to as a "Home for the Elderly," or the "Ozarks Methodist Manor." At all times prior to 1950 the facilities were owned and operated by the Methodist Church. Some of the land upon which the Manor is located was acquired from the St. Louis Conference of the Methodist Episcopal Church which in turn had acquired it from an institution known as the Marionville College, and some of the property was originally acquired by gift. The members of the Board of Directors of the presently existing corporation are nominated by the Health and Welfare Ministries of the East and West Conferences of the United Meth-

odist Church in Missouri. The Manor is one of 181 homes for aged persons operated under the auspices of The United Methodist Church in the United States. The Board of Health and Welfare Missions is the particular agency of the church charged with general supervision of such facilities. The free services given in 1971 on a national basis exceeded 10 million dollars. In the event the Methodist Manor should cease to operate, its property would revert to The United Methodist Church of Missouri under existing trust provisions, and the Manor has complied with the requirements of the certification council of the United Church and is entitled to and has received financial support from the church. The procedure to obtain financial assistance is to set an amount for each church to be obtained by voluntary gifts. No tax support or assistance is received from any governmental agency.

The Manor has not been required to pay a federal income tax, a Missouri income tax, or the Missouri intangible tax. It also has been deemed exempt with respect to the Missouri Inheritance Tax as to bequests made to it. In 1971, the Internal Revenue Service audited the returns and found that the Manor was a charitable organization and exempt from the income tax, and that there were no unrelated property or business being carried on by the Manor. Also, contributions made to the Manor qualify as deductible items for income tax purposes by the donors.

An exhibit was introduced in evidence showing a portion of the City of Marionville on which the Manor's properties are located. All the property of the Manor has not been subjected to an ad valorem tax. The entire project is operated as a unit, so it will be of some importance to set forth the use of the property not taxed as well as the use of the property that has been subjected to an ad valorem tax.

On Block 24 of College Addition, not subjected to tax, there is located the administrative offices, a residence hall of apartments (Wesley-Smith Hall), a health center, some nursing facilities, and a second residence hall where aged residents are housed. At the health center, and in the nursing facilities, care is furnished to those residents who are unable to care for themselves, some of whom are bedfast persons and require intensive care.

The remaining property, described below, has been subjected to an ad valorem tax.

Lots 176 and 179 of O'Dell's Addition are across a street to the west of the above property. These two lots, together with the above described tract, comprise what is known as the "original campus." On these two lots are located two courts of cottages designated as Wesley Court with eleven cottages, and Asbury Circle with eight cottages.

Lot 177 of O'Dell's Addition lies to the west of Asbury Circle, and located thereon are eight cottages known as Coke drive.

To the west of Coke Drive is Block One of Hayes Addition on which are located two courts of cottages known as Strawbridge Court with eight cottages, and Albright Circle with six cottages and another cottage under construction at the time of the hearing before the Commission.

A small area to the west of Block One of Hayes Addition, comprising five lots, is vacant and is used by some of the residents for gardening purposes.

South of Block One of Hayes Addition is a tract comprising all of Blocks Three and Four of Hayes Addition which is vacant land and is used by the Manor as a garden area to produce vegetables to be used in serving the meals in the two dining halls located on the area known as the "Original Campus."

We note that as of October 10, 1972, there were five groups of cottages, totaling 41 cottages and one under construction; not 43 cottages as stated in the assessment. Also the assessed valuation of $100,000 included areas on which no cottages were lo-

cated, but the assessment was "to be divided in proportion on the 43 units or cottages located at the Missouri United Methodist Retirement Home of Marionville, Missouri." Just how this was to be accomplished is not clear.

Appellant presented evidence through church officials that the care for the aged and concern for human needs is a major policy of the United Methodist Church, and has been since the years following the Civil War. Until recent years the general practice was to provide food and shelter but little more. In recent years the concept of care for the aged has changed, and it has become the accepted philosophy that in caring for the aged they should be provided facilities so they may enjoy their latter years, and to provide a feeling of security. Consistent with that concept, the Manor developed facilities to include dormitories and a health center, but also small cottages where the aged, while physically able, may live as nearly as possible in a home atmosphere, and when no longer able to do so, they will then have available to them the dormitories and the health center as a part of the overall facility.

The initial amount paid by a cottage resident is based on the construction cost of the cottage, and that amount constitutes a "life care lump sum." That sum is subject to a deduction for each month of residence based upon the life expectancy of the resident. In the event the resident becomes disabled he is transferred to the Health Center or to a dormitory, and the balance of the sum if any, is transferred to his credit at that facility, and continues as a monthly credit, based on life expectancy, on the cost of his care in the other facility, thereby reducing the amount payable by that resident for his care in the Health Center or dormitory. In the event the full amount of the "sum" is exhausted, that is, the resident outlives his life expectancy, he will continue "regardless of what happens in his financial situation" to receive care at the Manor. If he has remaining at time of death any amount of his "sum" there is

no refund. Also, if a resident dies, his or her spouse may remain as a resident for the remainder of his or her life.

When a cottage becomes vacant, another person or couple may become a resident, and there again will be paid to the Manor a "lump sum" based on the original cost of the cottage, and again a computation is made with reference to the life expectancy of the new occupant. The residents of the cottages pay their electric bill, but the Manor furnishes gas and water, maintains the cottage, mows the law, cleans the walks, and disposes of trash. A cottage resident, if single, pays $21, and if husband and wife pay $42 per month for cottage occupancy. The cottage residents may take meals at the dining halls of the Manor at the cost of $3.00 per day for three meals. No resident, whose funds have been depleted, has ever been turned out of the Manor.

None of the residents of the Manor pay the actual full cost of care. An exhibit was introduced showing the "normal rate" for each person in the Manor on October 10, 1972. This rate is fixed by the Board. It is in fact a fictitious rate because it is below the actual cost of the care of residents. The exhibit also shows the actual monthly payments made by each resident. Of the total resident population of 157, there were 52 who were being subsidized in whole or in part as to the "normal rate," but a subsidy results even as to those who pay the "normal rate" because it does not equal the actual cost.

For the 5-year-9-month period from April 1, 1965 to December 31, 1970, financial contributions from the two Missouri Conferences of the Methodist Church amounted to $240,462.85. Other contributions amounted to $61,321.21, resulting in a total amount of $301,784.06. During the 9-month period immediately before October 10, 1972, the Manor operated a deficit of $17,000, which must be and was paid from reserve funds. The history of the Manor is that it has always operated at a deficit,

and the difference is made up from contributions, mainly from the church.

Persons are admitted to the Manor on a nondenominational basis and substantially in the order of application without regard to ability to pay, however, as might be expected, preference is given to members of the Methodist Church.

Pursuant to § 6, Art. X, Const. of Mo. the Legislature enacted § 137.100 which states that certain "subjects are exempt from taxation for state, county or local purposes:

"(5) All property, real and personal actually and regularly used exclusively for * * * purposes purely charitable and not held for private or corporate profit, except that the exemption herein granted does not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom is used wholly for * * * charitable purposes."

■■■ It has long been the rule "that exemption statutes are strictly but reasonably (so as not to curtail the intended scope of the exemption) construed. * * * [C]haritable use exemption depends upon the use made of the property and not solely upon the stated purpose of an organization." Young Men's Christian Ass'n of St. Louis and St. Louis County v. Sestric, 362 Mo. 551, 242 S.W.2d 497, 502 (1951). "[E]ach tax exemption case is 'peculiarly one which must be decided upon its own * * * facts.' Taxation is the rule. Exemption therefrom is the exception. Claims for exemption are not favored in the law." Midwest Bible & Missionary Institute v. Sestric, 364 Mo. 167, 260 S.W.2d 25. However, Missouri has declared as its public policy that property actually and regularly used exclusively for charitable purposes shall be exempt from taxation, and the taxing authorities are not to be permitted to defeat that announced public policy by unreasonable or unrealistic application of the "strict construction" rule.

■■■ " 'The phrase "exclusively used" has reference to the primary and inherent use as over against a mere secondary and incidental use;'" Young Women's Christian Ass'n et al. v. Baumann, 344 Mo. 898, 130 S.W.2d 499, 502 (banc 1939), and " 'dominant use' or 'principal use' cannot be substituted for the words 'used exclusively.'" State ex rel. Koeln v. St. Louis Y.M.C.A., 259 Mo. 233, 168 S.W. 589, 590 (1914); Community Memorial Hospital v. City of Moberly, 422 S.W.2d 290, 295 (Mo. 1968).

■■■ Whether the use of property is for purposes purely charitable depends upon the definition of "charity" and "charitable purposes." There can be no doubt that the stated corporate purposes of the Manor are "charitable" within a reasonable and realistic definition of that term, and we do not understand that respondents contend otherwise. While the stated corporate purposes are of some importance, they are subservient to the use actually made. Young Men's Christian Ass'n of St. Louis and St. Louis County v. Sestric, supra. Missouri does not follow the partial exemption theory, and if any part of the property is used for a noncharitable purpose the whole is taxable. Evangelical Lutheran Synod of Missouri, Ohio and other States et al. v. Hoehn, 355 Mo. 257, 196 S.W.2d 134, 145 (1946); Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S.W.2d 38 (1948). We note that the Manor, consisting of the Health Center, residence halls, dining halls, the cottages and garden areas, is operated as a unit. Yet, the taxing authorities separated the cottages and garden areas from the remainder of the property and purported to subject only part of the property used in the total operation of the Manor to ad valorem taxes. In our determination of the issues we shall consider the operations of the Manor as a unit. Therefore, this case necessarily turns on whether or not it reasonably can be concluded that the Manor as a unit is regularly and exclusively used for purposes purely charitable.

■■■ In the long overdue findings of fact by the Commission, it found that the

Manor was a "not-for-profit corporation, organized and existing in the State of Missouri," and that the Manor is "a residential and retirement facility for persons over age 60." The Commission then described the physical property of the Manor and its use, including that portion upon which there has been no assessment of tax. Other findings of fact include the following: "The lump sum payments [made by cottage residents] represent the cost of a cottage when that particular cottage was built," and does not represent any amount based on life expectancy; "Where there is a difference between the monthly payment and the normal rate, the difference is made up from the Manor's reserve fund, which is maintained by church contributions, and legacies;" the lump sum paid by a resident is "amortized over the [resident's] life expectancy," and any unused portion of this investment is transferred as a credit to the health center or a residence hall and applied to a reduction of the monthly fees in those places, but if a resident dies, the remaining portion of the lump sum payment is forfeited to the Manor; "Many residents are not able to pay the full actual cost of their care," and when that occurs "the difference between what the [resident] is able to pay and the actual cost is made up by contributions from the Manor's reserve funds," and "the reserve fund itself is built up through church donations, gifts and legacies;" the Manor, when it accepts a [resident], "recognizes a moral obligation to give lifetime care to that [resident]," and "no resident has been discharged from the Manor because of inability to pay for care;" "The Manor has operated at a loss over the past ten years," but "church contributions, gifts and legacies have offset these losses so that the present reserve fund on hand is about $185,000," and "all the money in the Manor's reserve fund is used solely and exclusively for the operation of the Manor," and the Manor "receives no support from any Government Agencies through taxes, nor does it receive support from any other source than church contributions, gifts and legacies." From our statement of the evidence it is clear that these findings of fact are supported by the evidence.

In its conclusions of law the Commission stated that it was "impressed primarily with the fact that, essentially, each resident of the [Manor] pays his own way," and it concluded that the operation of the Manor was not "purely charitable, since the cost to the individual is admittedly based on the cost of operating the Manor." In arriving at its conclusion that the Manor was not entitled to the charitable exemption the Commission relied on the opinion of this court in Defenders' Townhouse Inc. v. Kansas City, 441 S.W.2d 365 (Mo.1969), although it admitted that the facts in the Townhouse case were not identical with the facts of this case.

We are immediately impressed with the fact that the findings of fact by the Commission (for example, that "Many residents are not able to pay the full actual cost of their care;" that the Manor has "operated at a loss over the past ten years;" and that the "difference between what the [resident] is able to pay and the actual cost is made up by reserve funds" which are obtained solely from "church donations, gifts, and legacies") are in direct contradiction to the statement in its Conclusions of Law, which appears to be the controlling feature of its decision, that "the cost to the individual is admittedly based on the cost of operating the Manor." This conclusion is not supported by the evidence nor by the Commission's findings of fact, and this is the distinguishing feature between this case and the Defenders' Townhouse case.

It is not possible to state briefly the rationale of the Defenders' Townhouse case, but it may be said that the basis for the result there reached was that the financial aspects of its operations were such that the residents bore the entire cost of operations.

"Neither Defendants' Townhouse nor Paraclete Manor [of Kansas City v. State Tax Commission, 447 S.W.2d 311 (Mo.

1969)] stands for the proposition that a not-for-profit operation to provide housing for the elderly loses its charitable nature because residents are charged for the facilities they receive. Missouri has long since abandoned the idea that charity can exist only for the indigent." See the consolidated cases of Westminster Gerontology Foundation, Inc. v. State Tax Commission, and John Calvin Manor, Inc. v. State Tax Commission, 522 S.W.2d 754 (Mo.1975). As there stated, the cases "point up the problems that exist when the beneficiaries of the charity are the sole providers of the financial means for the claimed charitable operation," which was the factual situation in those two cases. It was then noted that such a situation is in contrast to those to which the charitable exemption has been extended, and reference was made to cases from other jurisdictions involving homes for the aged where an exemption from taxes was approved on the basis that the operations were charitable including the following: Bozeman Deaconness Foundation v. Ford, 151 Mont. 143, 439 P.2d 915 (1968), where payments from residents would not pay the mortgage on the facility, and charitable donations were required to make up the difference; Fredericka Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P.2d 68 (1950), where the land buildings along with a $200,000 trust fund had been donated, and income from the residents provided only 65% of the cost of operation; State Board of Tax Commissioners v. Methodist Home for the Aged, 241 N.E.2d 84 (Ind.App.1968), where the home was constructed on land received as a gift and the church furnished one half of the cost of construction; South Iowa Methodist Homes, Inc. v. Board of Review, 173 N.W.2d 526 (Iowa 1970), where the building was purchased with church funds and the financing of additions was by way of donations from the Methodist Conference; Glass v. Oklahoma Methodist Home for the Aged, Inc., 502 P.2d 1268 (Okl.1972), where the operation of the home was subsidized by the Oklahoma Conference of the Methodist Church; and In re Tax Appeals of United Presbyterian Home, 428 Pa. 145, 236 A.2d 776 (1968), where the home was established by gifts and contributions from its members and friends. The above distinction between the cases was recognized in the Defenders' Townhouse case. In the consolidated cases involving Westminster Gerontology Foundation and John Calvin Manor, supra, there are cases cited "which have emphasized the use of payments of residents to defray the entire cost of the project in denying [tax] exemption to retirement residences," but in those consolidated cases recognition is also given to those cases where church or other contributions are necessary to meet the total cost of operation, and which has resulted in the operation being exempt from ad valorem taxes.

The facts of this case, and the findings of fact by the Commission, clearly demonstrate that a substantial portion of the total cost of the operations of the Manor is received from the two Missouri Conferences of the Methodist Church, and from other gifts and bequests. On this basis this case is to be distinguished from, and is not controlled by, the results in the Defenders' Townhouse, Paraclete Manor, Westminster Gerontology Foundation, and John Calvin Manor cases. All the operations of the Manor, including the use of the vacant land, the operation of the cottages, the residence halls, the health clinic, dormitories, and other facilities dovetail into and round out the charitable operation of the Manor as a unit.

The facts of this case are not in dispute. It is only the legal consequences of those facts that give rise to any controversy. There is no question of weighing the evidence, and there is no place for discretion to be exercised on the part of the Commission. The question is one of law, and we conclude that the operations of the Manor entitles it to the exemption from ad valorem taxes on the basis that its property is used regularly and exclusively for purposes

purely charitable within the meaning of § 137.100.

The judgment is reversed and the cause remanded for the entry of a judgment consistent with the views here set forth, and for such further proceedings as are appropriate.

HOUSER, C., concurs.

PER CURIAM:

The foregoing opinion by· STOCKARD, C., is adopted as the opinion of the court.

All of the Judges concur.