TRUSTEES OF LOCAL 88, MEAT AND RE-LATED INDUSTRIES, HEALTH AND WELFARE FUND TRUST, Plaintiffs-Appellants,

v.

STATE TAX COMMISSION of Missouri, James A. Robertson, Commissioner, John A. Williams, Commissioner, and J. Ralph Hutchison, Commissioner, Defendants-Respondents.

No. 49362.

Supreme Court of Missouri,

Division No. 1.

April 8, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied May 13, 1963.

David G. Dempsey and Eaker, Dempsey, Heath & Dempsey, Clayton, for appellants.

Thos. J. Neenan, Thomas F. McGuire, Stephen M. Hereford, Gary M. Gaertner, St. Louis, for respondents.

DALTON, Presiding Judge.

This is an appeal by the Trustees of Local 88, Meat and Related Industries, Health and

Welfare Fund Trust from the order and judgment of the Circuit Court of the City of St. Louis, entered in a proceeding instituted in that court to review a decision of the Missouri State Tax Commission ruling and holding that certain real property in the City of St. Louis, owned by appellants, was not "actually and regularly used exclusively * * * for purposes purely charitable" within the meaning of Section 137.100 (6) RSMo 1959 V.A.M.S. and Article X, Section 6 of the Constitution of Missouri 1945, V.A.M.S., and hence that it was "taxable and should be on the tax rolls of the City of St. Louis as of January 1, 1959." The Circuit Court affirmed the validity of the assessment of the mentioned property by the Assessor of the City of St. Louis, whose assessment had also been affirmed by the Board of Equalization of the City of St. Louis.

The real estate in question is located at 4484–90 Forest Park Boulevard in the City of St. Louis. The improvements consist of a building referred to as "The Medical Institute Building" which was built from funds distributed by appellants from what is referred to as the Local 88, Health and Welfare Fund Trust. Appellants, as such trustees, own the property and manage and control the operation of the Medical Institute housed in the mentioned building.

There is no dispute as to the assessed valuation of the real estate and improvements. The assessor had assessed the property for the year 1959 as follows:

"Land ..............$ 7,920.00
Improvements ......$200,000.00
    TOTAL ......$207,920.00"

The single issue presented for consideration on this appeal is appellants' contention that under Article X, Section 6, Constitution of Missouri 1945 and under Section 137.100(6) RSMo 1959 the mentioned property is exempt from taxation because it is "actually and regularly used exclusively * * * for purposes purely charitable." The issue is necessarily for determination under the peculiar facts of this case.

The purposes for which the mentioned Trust exists are stated in Article I of the Declaration of Trust, in part, as follows:

"The purpose of the Trust is to pay, either from principal or income, or both, for the benefit of employees as hereinafter defined, their families and dependents, for medical or hospital care, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, * * * and to build, erect, maintain, equip, manage and operate a nonprofit health and medical center or hospital, camp or other installation, as is more fully provided in Article IV, Section 2(i) of this Declaration of Trust. The term 'Employer' used herein shall mean any Employer who agrees with the Union (or with any other union placing the administration of its welfare program in the hands of the Board of Trustees on these same terms and conditions) to make payments to the Fund for this purpose. * * * The term 'Employees', as used herein shall mean all Employees (including dependents) of an Employer on whose account the Employer makes payment to the Fund; a dependent is defined to be a wife of an employee and shall include a dependent child or children as defined by regulations of the Board of Trustees. * * * No employee or his eligible dependents as defined herein shall be eligible for benefits from the fund until the expiration of thirty (30) days after the first of the month succeeding the date of his admission into the program; and every participant upon whom premium payments shall have been made (and his eligible dependents) shall be granted a thirty-day extension of benefits after termination, premium for which shall be paid by the Trust."

For convenience in further stating the facts, we shall first adopt a statement contained in an opinion by Thomas F. McGuire, Associate City Counselor, City of St. Louis, dated January 8, 1959 and addressed to Harold Jaeger, Assessor of the City of St. Louis, which statement was, at the hearing, admitted to be factually correct as to the

situation existing on January 1, 1959 relative to the matter under consideration, and, second, we shall supplement this statement with such material facts as were presented in evidence at the hearing before the State Tax Commission on December 3, 1959.

The opinion states that the Executive Administrator of the Medical Institute of Local 88, stated that the following factual situation existed as of January 1, 1959, relative to the subject premises.

"1. The Meat Cutters Local No. 88, A.F. of L.-C.I.O., Medical Institute was incorporated under Chapter 352, Revised Statutes of Missouri, 1949, on April 25, 1956.

"2. The objects and purposes of the Medical Institute are as follows:

" 'The object and purpose of the Association shall be to own and operate a hospital completely equipped for all medical, surgical, hospital and dental attention, and therein and thereat to provide free medical, hospital and dental service, or either of such services as may be determined for meat cutters and butcher workers who are members of Local No. 88, A.F. of L., their wives and dependents. The Association shall be non-profitable but said Association shall collect from the members thereof, if and when. required, such funds and money as may be agreed upon and set forth in the By-Laws of said Association and to do and perform such other acts and things compatible with the purposes of said Association as above outlined and as may be permitted them by law to do and which shall be fully set forth in their By-Laws.'

"3. The Medical Institute has completed the erection of a building at 4484-90 Forest Park Boulevard in which is provided medical, surgical and dental services to the members of the Meat Cutters Local No. 88 of the A.F. of L.-C.I.O., their wives and dependents.

"4. Medical, surgical and dental services rendered by the Medical Institute are on an 'out-patient' basis as of January 1, 1959.

"5. The building is not used for any purpose other than for the medical, surgical and dental treatment of members of the Meat Cutters Local No. 88, their wives and dependents. The building and premises are not used for political, business or for purpose of pecuniary gain or profit of the members of the Meat Cutters Local No. 88. The use of this building by doctors on the staff of the Medical Institute for the treatment of patients other than members of Local No. 88, their wives and dependents, is not permitted in the building or on the premises. The treatment rendered is limited to the members of Local 88, their wives and dependents.

"6. The Medical Institute engaged doctors and other personnel required in the medical, surgical and dental treatment of the members of Local No. 88, their wives and dependents.

"7. The Medical Institute is financed by funds contributed by the employers of members of Local No. 88, to the Management-Union Health and Welfare Fund pursuant to contracts negotiated between the employer and union governing wages, working conditions and 'fringe' benefits. Under these contracts the employer is required to pay into such fund a stipulated monthly amount for each member of Local No. 88 in his employ. This Health and Welfare Fund is under the administration, supervision and direction of five trustees, two' representing the union, two representing the employer and one selected jointly by the union trustees and the employer trustees."

In the hearing before the State Tax Commission Nicholas M. Blassie testified that he was President of the Meat Cutters' Union and also a Trustee Member of the Local 88, Meat and Related Industries Welfare Fund Trust; and that the fund was established in December 1952 and has operated since that

time. He further said: "* * * 'we wouldn't be able to get doctors into our Hospital unless they were allowed to cater to medication of humanity, and we invited and provided that, * * * we should receive the same treatment as others,—and nobody pays in our Organization." (This testimony as to treatment of outsiders apparently conflicts with the admitted provisions of the Declaration of Trust which, it is conceded, controls the operation of the facility and it is also in conflict with the subsequent testimony of the witness, as follows:

"Q You are 'bounded' or 'limited' by this 'Agreement and Declaration of Trust'; is that correct? A That's right.

"Q The actual use of the property, we will say, then, is confined to—and I am saying *'confined'* to the Members of the Local 88, is that correct? A —And their dependents.

"Q —And their dependents? A Yes.

"Q Then, from time to time, if someone is picked up in the street and brought in, your doctors will attend them?

"A Yes; that happens sometimes.

*     *     *     *     *     *

"Q I see. But, is this true, we will say, 95% of the facilities are actually used by the Members and their families?

"A And their families.

"Q —and their families, exclusively, is that correct?

"A Yes, sir."

The record further shows:

"Q Your patients are only members of these Local Units of your Organization?

"A Not just limited to the Member— any member of that family is included.")

The witness further testified that he periodically negotiates union contracts and, as a part of the contracts, he negotiates also "fringe benefits" for the employees, that is,

per capita for such employees that work forty hours per week; and that under present contracts the employer pays $29.70 per employee, and employee "includes both employees and dependents." The $29.70 per employee (and dependents) that is, "per capita per worker" is paid into the Trust Fund. It is paid in on a monthly basis, that is, "the employer turns that over on a monthly basis" as a part of the "fringe benefits." This fund when turned over to the trustees is used "to build the building, erect the facilities, hire doctors, nurses, technicians and other clerical personnel."

As to how the program was supported, the witness further testified that it was supported "through the customer in the Meat Market buying foodstuffs, he supports it. * * This Health and Welfare Program, * * * that is negotiated with a working-late contract, it is part of our Union Contract but it is separate * * * he [employer] pays it into this Trust, and the monies that are paid by the Employer through this Labor Contract, which is part of it, that is how we acquire this Fund, the Employers pay it, legally, to each Employee." He further said that when a member of the union, or any member of that member's family, comes to the Institute for examination or treatment there is absolutely no charge made to him.

The witness further testified: "* * * we can't charge anybody * * * because the employer would lose his Tax-Exempt Status on that." This payment is all the "cost-of-doing-business" to the employer, indirectly, since it is the ultimate consumer who buys the meat. The payment is part of the employer's labor cost.

The witness further testified that the facility (The Medical Institute) is operated at the present time on an out-patient basis; and that sometimes they had to keep a patient three or four hours and "under the law we have to provide hospital bed service." The facility has all the equipment needed to operate on an out-patient basis, although it can keep a patient overnight, if

he cannot be moved, and, accordingly, the facility has four beds. It was stated that the Medical Institute was "operating under the Trust Agreement, which is a non-profit organization * * * rendering medical care to a segment of our society in the City of St. Louis."

From the evidence and exhibits the State Tax Commission found that the funds to build, maintain, operate, and equip the aforesaid building, and to use and operate the facility as a clinic for the medical, surgical, and dental treatment of members of Local 88 and their dependents, was secured and supplied by contracts with employers of members of Local 88 through union contracts with Local 88; that in accordance with the terms of such union contracts between the employers and Local 88, the employers are required to pay into a fund the sum of $29.70, per employee per month, and these funds are used to operate, maintain, and equip the aforesaid building, and to hire medical and other personnel to render medical, surgical and dental services to the members of Local 88 and their dependents. As a conclusion of law, the State Tax Commission found that the "subject property was not used, as of January 1, 1959, exclusively for religious worship, schools or colleges, or for purposes purely charitable, within the meaning of Section 137.100, Revised Statutes of Missouri, 1949, and Section 6, Article X of the Constitution of Missouri, and is taxable and should be on the tax rolls of the City of St. Louis as of January 1, 1959."

Appellants contend that the court erred in affirming the decision of the State Tax Commission. Appellants and respondents rely upon the same statute and constitutional provision.

Article X, Section 6 of the Constitution of Missouri 1945, dealing with exemptions from taxation, in part, provides: "* * * all property, real and personal, not held for private or corporate profit and used exclusively for religious worship, for schools and colleges, for purposes purely charitable * *

may be exempted from taxation by general law. All laws exempting from taxation property other than the property enumerated in this article, shall be void."

The statutory provision relied upon is Section 137.100(6) RSMo 1959, which, in part, provides: "All property, real and personal actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable, and not held for private or corporate profit shall be exempted from taxation for state, city, county, school, and local purposes * * *."

In support of their position on this appeal, appellants first state that their "property is used solely to provide free medical, dental and surgical care to members of Local 88 and their families"; and that "in so doing the Medical Institute makes it more likely that they will become more healthy and useful citizens and less likely that [they] will need the benefits of public institutions or governmental assistance."

■ Excluding the word "free", we agree that it clearly appears from testimony offered and from controlling documentary evidence that the property in question is, in fact, used and can only be used to provide "medical, dental and surgical care to members of Local 88 and their families." While there is no evidence whatever in support of the second point, nevertheless we may assume that the Medical Institute renders a beneficial service, which may result as indicated.

Appellants' counsel stated to the State Tax Commission that "we serve any one in cases of emergency there", and witness Blassie, as stated, testified that "we wouldn't be able to get doctors into our Hospital unless they were allowed to cater to medication of humanity, and we invited that and provided that, * * * we should receive the same treatment as others,—and nobody pays in our Organization." Assuming that the statement and testimony is correct, it is not controlling on the issue here presented

in view of the provisions of the Declaration of Trust and other admitted facts and written documents.

█ Appellants further insist that "the operation of the Medical Institute is entirely non-profit * * *." With that statement we must agree, since the evidence supports the contention and there is no evidence whatsoever to the contrary. However, the fact of "non-profit" is only one of the several requirements of the statutory and Constitutional provisions necessary to authorize the exemption of the property from taxation.

Directing attention now to appellants' further printed argument in support of their claim that the property occupied by the Medical Institute is entitled to exemption from taxation, we find that appellants, with commendable frankness, have stated the precise issue for decision as follows: "At the very heart of the problem, then, is the method of operating and financing the Medical Institute. Seen in this light the ultimate issue to be decided by this Court is whether appellants' property is non-exempt because: (1) participation in the free medical services is restricted to union members and their dependents, and (2) financing of the Medical Institute is obtained from a trust fund which receives its revenues from employers of the union members pursuant to collective bargaining agreements."

Appellants further insist that their property is "clearly used for purposes purely charitable" within the meaning of the mentioned statute and constitutional provision. The record does not factually support that conclusion. We find no evidence that the property is exclusively used for purposes "purely charitable," instead, it clearly appears from this record that Local 88, by contract with the employers of its members, has required the employers to provide the necessary funds which the trustees have used, and were required to use, to build the Medical Institute building, to equip it and to provide the medical, dental and surgical care now furnished to members and their

dependents. In other words, it clearly appears from the record in this case that Local 88, by contract with the employers of its members, have required employers to pay over additional funds for their services, which funds are referred to as "fringe benefits", and which are, in fact, only additional compensation for services rendered by the employees (members of the union) to their employers. This compensation is not "a free donation" by the employers to the employees for the purpose of providing the medical, dental and surgical care to members of Local 88 and their dependents, but the payments are actually made under written contracts negotiated with employers who provide the funds for the so-called "free medical, dental and surgical care." We find no charity about it. It is just a method of collecting, on behalf of employee members of the union, additional sums for services rendered employers and using such sums to provide and pay for the "medical, dental and surgical care." It is in no sense "free" since it is paid for out of a portion of their own earnings. As stated, the employee members of Local 88, through the union and by contracts negotiated with employers, receive "fringe benefits" as compensation for services rendered and, under such contracts and under the Declaration of Trust, the Trustees are required to use the money so obtained to furnish and pay for the medical and dental services which the union members and their dependents may require. Further, the medical, dental and surgical care furnished, is not furnished employee members on a basis of financial need or by reason of inability to pay for such services. Instead, all members in good standing and within the provisions of the Agreement and Declaration of Trust are equally entitled to the benefits of the services provided by the Medical Institute.

Appellants argue that "many cases have listed relief from suffering and disease as one of the most traditional and prominent forms of charity", but they neglect to add that the rule does not necessarily apply where the relief from suffering and disease

is provided for by contract with the employer of the one receiving the relief so that the one receiving the relief is not obtaining a gift or charity, but is only obtaining what he has contracted to receive, as a part of the payment for his own labors under the term "fringe benefits." Appellants do state that "no Missouri case has ever considered the precise issue before this Court", but claim it has been decided in Kansas and in Texas.

Before dealing with the specific decisions upon which appellants rely to support their contention of error, perhaps we should say that appellants rely upon their statement, not supported by evidence, that "the operation of the Medical Institute * * * is essentially the same as that of private hospitals, particularly railroad hospitals, and other organizations which have had a tax exemption status approved by this Court or courts of other jurisdictions."

Appellants in their hearing before the State Tax Commission stated that "a federal income tax exemption status" was granted by the Internal Revenue Service of Washington, D. C.; that the decision (evidenced by a letter offered in evidence) was affirmed as late as November 23, 1959; that the Medical Institute had been granted the status of a "hospital" under the zoning requirements of the City of St. Louis; that "all hospitals are placed on tax-exempt basis in the City of St. Louis," including all "organizations in St. Louis who serve, medically, specific groups of persons within our society," including the Missouri Pacific Hospital; that "all Clinics are placed on an Exemption-from-Tax-Status," including nursing homes such as "Mary Ryder, Wohl, and Barnard Clinic, * * * and many others"; that appellants' investigations disclose "several Institutions here that were * * * profit-making Institutions * * * had Tax-Exempt Status"; that these are "Missouri Pacific Hospital, Park Lane Hospital, and other Hospitals who make charges and are in business for profit"; and that these several institutions have a

tax-exempt status from the U. S. Treasury Department and also from the City of St. Louis. Somewhat the same argument is made in this court, to wit, that appellants should "be given the same treatment" as others.

The record, of course, fails to contain the evidence upon which a tax-exempt status was granted to any of these several institutions, however in deciding this case, we are limited to the specific facts shown by this record with reference to the specific property owned by appellants and the specific use made of it by them. On these facts we must determine whether this specific property is subject to tax exemption under the specific provisions of the Constitution of Missouri and the specific applicable state statute. What has been done or may be done in other instances and under other circumstances is not controlling on this court, since we are bound by the evidence in this case with reference to the specific property sought to be held exempt from taxation.

Appellants cite the case of Fitterer v. Crawford, 157 Mo. 51, 57 S.W. 532, 50 L.R.A. 191. In that case exemption was denied because a portion of the building sought to be exempted was rented for commercial purposes. The court also stated the rule with regard to the construction of laws exempting property from taxation, to wit, that the burden of proof rested on claimants seeking exemption and that a strict construction of an exemption statute was required. The court said: "In the construction of laws exempting property from taxation it is a cardinal principle that they must be strictly construed. As a rule all property is liable to taxation, exemption the exception, and it devolves upon the person claiming that any specific property is exempt to show it beyond a reasonable doubt."

The court also made an obiter statement, which this court in the case of In re Burroughs' Estate, 357 Mo. 10, 206 S.W.2d 340,

344, 174 A.L.R. 524; said was "in harmony with the trend of this court's opinions in later cases." The obiter statement was to the effect that: " 'Our conclusion is that Masonic lodges are organized for charitable and benevolent purposes, with no incentive to private or corporate gain, but whose revenues derived from whatever source they may be, *are applied to the payment of their current expenses, and the relief of their afflicted and needy members and their families;* and, although their charity is restricted to such use, they are charitable institutions.' " (Italics ours.) (57 S.W. 532, 535.)

In the case of A. T. & S. F. Hospital Ass'n v. State Commission of R. & T., 173 Kan. 312, 246 P.2d 299, decided July 3, 1952, the Kansas Supreme Court held that a hospital owned by the plaintiff Association was used exclusively "for charitable and benevolent purposes" and was exempt from taxation in that state. The hospital in question, having 175 beds, had been built in part with large contributions from the railroad company and the company had continued to contribute large sums to its operation, maintenance and improvement. No part of the property was used for other than hospital purposes. All employees of the railway company and of the hospital association were compelled by the railroad to become members of the hospital association and were required to pay monthly dues computed on a bracket system based upon their respective earnings. The court reversed the finding of the Tax Commission, which had held that the hospital was operated as a private institution in a manner equivalent to a compulsory group hospital plan, available only to members who were also employees of the railroad company and who were required to become dues-paying members of the Association; that the hospital was maintained solely for the benefit of the railroad company and its employees and was not a benevolent and charitable institution; that its property was not exempt from taxation as property "used exclusively for benevolent and charitable purposes." The theory upon which the State Tax Commission decided the matter was also said to be on the basis that it was an exclusive affair, with the public barred from the use of the facilities, and that it was "comparable to an exclusive club with the benefits accruing only to its closed membership." In reversing the Tax Commission the Kansas court held that the statute and the constitutional provisions of that state based exemption upon the *use* of the property. The court disregarded other admitted features of the evidence and treated the case as showing the operation of a charity comparable to those that provide for the care of the poor and dependent, the aged and the infirmed, orphans and those in financial distress. The court ignored the fact that, except for the voluntary contributions by the railroad, the dues-paying members of the Association were merely paying for the services that they were entitled to receive in return for their payments.

In the case of City of Palestine v. Missouri-Pacific Lines Hospital Ass'n, Court of Civil Appeals of Texas, Amarillo, 99 S.W.2d 311, 314, the court held that a hospital association which had been established by a railroad for its employees, which was maintained by monthly deductions from employees' wages, served employees of various railroads and families without charge, and which treated, in return for compensation by a railroad company, passengers and others injured by railroad trains, was an institution of "purely public charity" and exempt from taxation. The court made much of the fact that the hospital was not operated for gain or profit and that it accomplishes ends wholly benevolent, and benefits persons indefinite in numbers by preventing them, "through absolute gratuity," from becoming burdens to society or to state. The building was built by the railroad and given to the hospital association.

Appellants have also cited the following Missouri cases: Salvation Army v. Hoehn, 354 Mo. 107, 188 S.W.2d 826; Young Men's Christian Ass'n v. Sestric, 362 Mo. 551,

242 S.W.2d 497; In re Burroughs' Estate, supra, 206 S.W.2d 340 and St. Louis Gospel Center v. Prose, Mo.Sup., 280 S.W.2d 827. We do not find these cases controlling under the facts in this record.

Appellants insist that the Kansas and Texas cases relied upon "are squarely in point"; and that "the only distinction between them and the instant case is that the railroad hospitals were apparently organized by the railroad companies, whereas the guiding spirit behind the Medical Institute was a labor union." Appellants also insist that the payments to their Health and Welfare Fund Trust were voluntarily made, as were the railroads' contributions in the Kansas and Texas cases. Appellants state that "The employers enter into these ["fringe benefit"] contracts voluntarily and in that sense the payments made to the trust fund are 'voluntary' "; and that "They are just as voluntary as the payments made by the various recipients of services in the [Kansas and Texas] cases above cited."

In both the Kansas and Texas cases the railroads had made *large voluntary contributions* to the respective associations for the construction, operation and maintenance of the said hospitals. No similar facts appear in evidence in this case. However, we do not agree with the reasoning and conclusions reached on the facts in either of said cases and we decline to follow them. Further, as hereinbefore stated, the contributions of the employers in this case to the Health and Welfare Fund Trust were made under contracts negotiated between the employers and the union, representing the employees. The payments represent "fringe benefits" negotiated at the time wages and other terms of employment were entered into, and the so-called contributions by the employers are, in fact, additional compensation for services rendered by the employees.

■ On the facts shown by this record, the property in question is not "actually and regularly used exclusively for * * * purposes purely charitable," but is used in accordance with business arrangements and contracts between the parties. Phillips v. St. Louis & San Francisco R. Co., 211 Mo. 419, 435, 111 S.W. 109, 112–113, 17 L.R.A., N.S., 1167.

The judgment is affirmed.

All concur.