235 F.Supp. 60 (1964)
Robert W. HAMMERSTEIN, Executor and Trustee under Will of Katherine B. Schlueter, a/k/a Katheryne B. Schlueter, deceased, Plaintiff,
v.
Alvin M. KELLEY, District Director of Internal Revenue, St. Louis, Missouri, Defendant.
No. 62 C 174(1).
United States District Court E. D. Missouri, E. D.
October 2, 1964.
Lackland H. Bloom and Robert W. Hammerstein, Jr., St. Louis, Mo., for plaintiff.
Richard D. FitzGibbon, Jr., U. S. Atty., John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for defendant.
HARPER, Chief Judge.
Plaintiff, as Successor Trustee under the will of Katherine B. Schlueter, deceased, brought this suit for a refund of a part of the federal estate taxes paid by the executor of the estate. Under Section 2055 of the Internal Revenue Code the value of the estate to be taxed is determined by deducting those amounts bequeathed to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, and no part of which inures to the benefit of any private stockholder or individual and if no substantial part of the activities of the corporation is carrying on propaganda, or otherwise attempting, to influence legislation.
*61 After providing for certain specific legacies, Mrs. Schlueter provided in her will under provision SIXTEEN that the entire residue of her estate go to Robert W. Hammerstein, original trustee, to be held in trust for the benefit of the St. Louis Medical Society, with the annual income of the trust to be paid to the society and to be used for library purposes. This trust was to continue for twenty-five years, or it could be ended sooner, in the sole discretion of the trustee. In either event, the entire principal and accrued income was to be paid over to the St. Louis Medical Society.
When the executor filed the estate tax return on Mrs. Schlueter's estate, the value of the residue under provision SIXTEEN was $400,914.19, which was claimed as a charitable deduction. The Internal Revenue Service disallowed the deduction and assessed an additional estate tax, which was paid. Plaintiff in this action claims that $88,449.53, plus interest of $15,977.81, assessed on the residue of the estate left in trust, was wrongfully assessed by defendant as an additional tax due, and seeks a refund of $104,427.34. The basis of the suit is that defendant wrongfully disallowed the charitable deduction taken by the executor on the residue of the estate left in trust, in that the bequest in trust is for the benefit of the St. Louis Medical Society to be used for library purposes and qualifies under Section 2055 Internal Revenue Code of 1954 as an allowable charitable deduction in the payment of estate taxes. The defendant contends that the St. Louis Medical Society does not qualify under the applicable section as a charitable organization and, therefore, plaintiff is not entitled to a refund of the taxes paid.
There has always been a recognition of the importance of charities in this country by Congress and it has usually exempted them from the tax laws it has enacted. These exemptions have almost consistently been worded alike and in language similar to that found in Section 2055. The same wording is used to exempt the income of charities from income taxes, payment of Social Security taxes, and to allow deductions from personal income, gift, and estate taxes. The courts have interpreted this language in cases dealing with these many types of taxes and the interpretations have been fairly consistent. Some of the cases discussed involve different types of taxes, but treatment of the charitable deductions of the courts have been the same regardless of the type of tax involved.
The Internal Revenue Service and the Tax Courts have clearly established their position in regard to medical societies as charities. In Colonial Trust Co. v. Commissioner, 1930, 19 B.T.A. 174, a local medical society with almost identical purposes and activities as the St. Louis Medical Society was denied a charitable status. Later came I.T. 3182, C.B. 1938-1, p. 168, based on the Colonial Trust case, and denying exemption to another medical association.
Relying on other authorities, there are two ways to approach the first question proposed in this case; one would be to evaluate the activities of the Medical Society in light of the activities of other organizations which courts have held to constitute charitable activities and thus entitled to an exemption. There are cases of this type, mainly involving bar associations, where the specific activities involved are discussed, and those organizations were held to be charitable. The plaintiff takes the position that those cases are similar to this case. The applicable cases will be discussed later. However, the preferred method to settle this problem is to first consider the basic idea or concept of a charity, apply the activities of the St. Louis Medical Society to it and determine whether they constitute it a charity. The determination of the charitable status is a factual one and each case is decided on its own merits. First, it is interesting to note what the courts have said as to the existence of a charity. In United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, 483, it was said: "The term `charitable' is a generic term and includes literary, *62 religious, scientific and educational institutions."
The United States Supreme Court has said very little in this area of exempt charities and there are few clear decisions on it from other courts. In Duffy v. Birmingham, 190 F.2d 738, 740, the court considered exempting a charity from income taxation, and said:
"The reason underlying the exemption granted by section 101(6) (1946 Code) to organizations organized and operated for charitable purposes is that the exempted taxpayer performs a public service. The common element of charitable purposes within the meaning of the section is the relief of the public of a burden which otherwise belongs to it. Charitable purposes are those which benefit the community by relieving it pro tanto from an obligation which it owes to the objects of the charity as members of the community."
In an earlier case, the same court was considering an estate tax deficiency in St. Louis Union Trust Co. v. Burnet, 8 Cir., 59 F.2d 922, 926, and there adopted the definition of a legal charity from Jackson v. Phillips et al., 14 Allen (Mass.) 539, 556, as follows:
"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature."
And further, 59 F.2d at page 927:
"A charitable use, where neither law nor public policy forbids, may be applied to almost any thing that tends to promote the well-doing and well-being of social man. (Citing Authority)"
Underwriters' Laboratories v. Commissioner of Internal Revenue, 7 Cir. 135 F.2d 371, 373, dealt with corporate income taxes, and held: "An institution that operates primarily for the benefit of private parties and only incidentally for the public is not a charitable institution in fact or within the meaning of the statute under consideration." The court also denied claims of scientific and educational features, since any of these that did exist were not for the benefit of the public, but were only incidental to the organization's main concern, the interests of its members.
In tax exemption cases, the taxpayer-plaintiff carries the burden of proof on all issues: First, that it was organized exclusively for charitable purposes; second, that it was operated exclusively for charitable purposes; third, that no part of its net earnings inured to the benefit of any private shareholder or individual; and fourth, that no substantial part of its activities consist of carrying on propaganda or otherwise attempting to influence legislation. Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451; Duffy v. Birmingham, supra.
One of the few United States Supreme Court cases in this area is Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67, which dealt with social security taxes and a claimed charitable existence because petitioner was organized and operated exclusively for scientific and education purposes. The claim was denied in an opinion by Murphy, J., where it was said, at page 283, 66 S.Ct. at page 114:
"In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number *63 or importance of truly educational purposes."
The cases hold a charity is a broad term, conveying more an idea than a specific meaning; it relates to the social good, the welfare of the community, existing for the good of the people as a whole. In this regard the facts disclose that the St. Louis Medical Society is not a true charitable organization, but rather, is an organization composed of members of a particular profession who have common interests and aims, and an organization which has one prime concern and purpose  the welfare of that profession. The purpose for which the Society was organized and is operated escapes the general good required by the authorities, and instead, becomes of a limited interest and purpose, serving only individuals, or at most a specific group, rather than the general good. The benefits it confers by its existence and operation are upon the individual and thus it cannot be exempted; its service to the individual is not merely secondary or incidental, but rather is primary. There is no question as to the many good works of the Society; many of its activities are indeed very praiseworthy; but its primary concern and purpose still remains to be the best interests of the medical profession and the individual members of the Society. Its organization and operation fail in the exclusiveness required to constitute it a charity.
Plaintiff relies on its evidence as to the activities of the Society and also upon a series of cases involving what it claimed were similar situations which were held to be charitable. Rhode Island Hospital Trust Co. v. United States, D.C., 159 F.Supp. 204, involved a gift in trust for the Rhode Island Bar Association. The District Court of Rhode Island held that the gift tended to the benefit of mankind and was for the public convenience, and since it was in trust for specified charitable purposes "it is immaterial whether the Association is an organization organized and operated exclusively for religious, charitable, scientific, literary or educational purposes." (l.c. 208) The court did not actually determine the status of the Rhode Island Bar Association as a charity. The trust was a valid one (for charitable purposes only), so the status of the Association was immaterial. It was not until Dulles v. Johnson, 2 Cir., 273 F.2d 362, 80 A.L.R.2d 1338, that a bar association was held to be charitable. There, bequests were made to the New York City, County and State bar associations; charitable deductions were taken for these bequests on the estate tax return, but were disallowed. The suit for a refund was denied in the District Court, but this was reversed on appeal. Four activities of the associations were emphasized and discussed, l.c. 365: (1) Regulation of the unauthorized practice of law  the court held this to be a protection to the public, not the bar, and pointed out certain statutory powers given the bar in this regard; (2) disciplining of the profession  statutory authority of the bar was again noted, and the court recognized the unique and important role of lawyers in society, and that the benefit of a disciplined profession accrued to the public; (3) improving court procedure and endorsement of judicial candidates  these functions had been non-partisan and the efforts clearly constituted a public service and no selfish professional benefit was sought; and (4) influencing legislation  the major portion of this activity was technical work and served no selfish purpose of the legal profession. The legislative recommendations were not intended for the economic aggrandizement of a particular group.
Plaintiff contends that similar activities on the part of the St. Louis Medical Society serve to constitute it a charitable organization. But, as the testimony of plaintiff's witnesses and the exhibits introduced will show, the function of the Society is not as broad in its effects nor in its interest. While the Society has an Ethics Committee, it has no legal powers nor statutory basis. The same goes for disciplining members of the medical profession. As to endorsement of candidates for public office, it was shown that there was frequent participation in such activity *64 which was based entirely on the interests of medicine and a candidate's stand in regard to legislation affecting the profession. The following is a summary of the testimony and the exhibits introduced into evidence as to some of those activities of the Society which clearly are not charitable:
A) Legislative work: The Society maintains a legislative committee which is a subcommittee of the Public Relations Committee, and one of its responsibilities is "to make the Society's policies and attitudes known to officials who direct governmental organizations." (56 Bulletin 195.) And further, "On a local level, all municipal legislation that may directly affect the medical profession is a committee responsibility."
Matters the Society has specifically concerned itself with have been, (1) opposition to House Bill 7225 before Congress in 1956 to lower the social security age; (2) legislation dealing with medical treatment in Veterans Hospitals; (3) opposition to the Medicare Bill; (4) St. Louis Municipal and County legislation; (5) professional incorporation legislation; and many other instances of the Society speaking for the profession in regard to legislative matters affecting its members. Communications with state legislators, United States Senators and Members of Congress have been frequent; the Society has enacted formal resolutions in regard to certain legislative matters; there has been much discussion at Society meetings on such matters; speakers on specific topics have been engaged; and as shown by Defendant's Exhibit P, the Society has placed paid advertising in the newspapers in opposition to compulsory health insurance and endorsing voluntary health insurance. Plaintiff's Exhibit 12, page 11, reviews the role of the Society in legislative circles and states: "The St. Louis Medical Society has approved in principle, fostered, co-sponsored or originated state legislation on * * *," and there follows a lengthy list of legislative topics. 51 Bulletin 243 (Exhibit 8) contains an article giving doctors tips on how to take action on pending legislative matters and ends with: "A readable, penned note on a prescription blank with your personal signature is worth much more than a long dissertation copied from an agency release."
52 Bulletin 99 (Exhibit 9) carries an editorial originally published in a metropolitan newspaper, praising a state executive for a position taken in regard to federal aid to education. Practically monthly the Bulletin carries other articles in regard to various legislative proposals. In summation, the activities of the Society, its committees, and its members have too often been guided toward influencing legislation not necessarily affecting the medical profession directly, but matters it is only interested in incidentally. While there is no evidence of financing lobbying efforts, the Society has certainly achieved the same end by its own activities.
B) Political activities: The Society has even gone to the extent of endorsing candidates for political office. 56 Bulletin 406: "Two St. Louis Medical Society members present themselves for nomination to public office in the August primaries, with impressive appeals to fellow members currently enlisted in the battle against threatened socialized medicine." The article then proceeded to name the two candidates.
In 1962, a letter was sent to the members of the Society over the by-line of the Legislative Committee urging support in the general election of named candidates and specifically opposing the incumbents because of their favoring bills that might lead to socialized medicine (Tr. 381-382; Exhibit R). This letter of October 5, 1962, which was circulated October 24, was later repudiated by the council of the Society on December 14 (Exhibit Q), though the election was on November 6, and the council had met and made its decision on November 2.
The Society, through its Bulletin, made a regular practice of urging the membership to contact their legislators in support of or opposition to specific legislation. Thus, the Society has taken steps *65 to virtually become a political action organization.
C) The Society has waged an active campaign in the public relations area through its Public Relations Committee: The Committee has its own budget, and this has been increased at times by membership assessments (48 Bulletin 67) and extra allocations by the Budget Committee (50 Bulletin 161). In Exhibit 12, page 16, there appears the following: "In recent years a public relations consciousness has been present in developing St. Louis Medical Society activities  Public Relations is, in fact, woven into the important segments of the St. Louis Medical Society's total program." In the minutes of the meeting of the Society Council of May 14, 1957, is the following: "On motion the Council directed the secretary to write a letter to the President of the Council of the Missouri State Medical Association, inquiring why there was no publicity on the unanimous vote against accepting federal funds under Public Law 880." The Bulletin and the minutes reveal an extreme awareness of the amount of public exposure the medical profession receives in the press, radio, television, etc. The transcript shows the extent of the Society's activities in this area.
There are many other activities of the Society that could be discussed but will only be mentioned here. They serve to show how far afield the Society has gone out of consideration of its members, and they are: a) one annual edition of the Bulletin is devoted to a roster of physicians, pharmacies, hospitals, nurses, etc.; b) the Society aids the physician placement service of the State Association; c) a patient referral service; d) a collection agency for doctor's fees, still in existence, though largely inactive; e) printing business cards, stationery, prescription blanks, etc., for members at cost; f) a telephone answering service for members; g) a Grievance Committee, though with no legal powers or authority, to consider complaints against members; h) a group insurance program; i) publishes advice on tax matters, office management, economic practices and organization; and j) the Society works closely with the Missouri Medical Service which administers the Blue Shield health insurance plan. The Society names representatives to the Service's board of trustees, and devotes much space in the Bulletin and time at its meetings for discussion of the insurance program and policy, and has frequently taken official positions in regard to it.
There is no dispute as to the existence of the medical library and its good purpose; nor as to the medical lectures on new techniques and practices. These and many other facets of the Society are unquestioned good works carried on that were spoken of earlier, but the activities just mentioned and discussed are presented as to the "exclusiveness" of the purposes for which the Society was organized and operated and as to the "substantial" part of its activities in carrying on propaganda (public relations, etc.) and otherwise attempting to influence legislation (Section 2055). "`Organized and operated exclusively' means only that these unconforming activities be incidental in nature." Dulles v. Johnson, supra, l.c. 368. That is, when any non-charitable actitivities become more than merely incidental to the charitable end, then the charitable status will fall. And further, the presence of a single substantial nonexempt purpose will defeat a claim of charitable status. American Institute for Economic Research v. United States, Ct.Cl., 302 F.2d 934, 937.
Despite the charitable and educational activities of the St. Louis Medical Society admittedly existing, its activities are quite clearly not exclusively within that category, nor are its activities in the legislative sphere non-substantial. The evidence is quite clear that many of its activities, including the political and legislative activities of the Society, prevent it from being a charitable organization within the meaning of Section 2055.
Plaintiff trustee makes a further contention that even if it be determined in *66 this suit that the St. Louis Medical Society is not a charitable organization under Section 2055 of the Internal Revenue Code, still the library fund set up by the Schlueter bequest is a gift in trust and as such, comes under Section 2055(a) (3). Section 2055(a) (3) provides in effect that the value of the taxable estate is determined by deducting the amount of gifts to a trust if such gifts in trust are to be used exclusively for religious, charitable, scientific, literary, or educational purposes, etc. Under this section it would not matter what the activities of the Society were, so long as the trust was a valid one and the fund set up was used for specified purposes. This was the situation in Rhode Island Hospital Trust Co. v. United States, supra, where the court held the bequest was in trust and was to be used only for specified charitable purposes, and therefore, "Since it was a gift in trust for such purposes, it is immaterial whether the Association is an organization organized and operated exclusively for religious, charitable, scientific, literary or educational purposes." (159 F.Supp. l. c. 208.) However, the same does not apply to the case at bar. The specific bequest in question is found in paragraph SIXTEEN (d) of the Schlueter will. The trustee is to hold the trust estate for the benefit of the St. Louis Medical Society with the annual net income to be paid to the Society to be used for library purposes. The trust is to continue for not more than twenty-five years, "but may be closed before that time, at the sole discretion of my Trustee, should he deem it advisable to do so." When the trust ends, both the principal and accrued income shall be paid over to the Society. As is shown by this provision of the will, there is no absolute limitation that the bequest be used for library purposes, for the trustee may terminate the trust at any time and pay over the bequest to the Society absolutely. There is no certainty that the trust will be used for the claimed charitable purposes, and the cases have consistently held that deductions shall not be allowed where there is no assurance that the intended charity will receive the specified benefits from the bequest. Commissioner v. Sternberger's Estate, 348 U.S. 187, 75 S.Ct. 229, 99 L.Ed. 246; St. Louis Union Trust Co. v. Burnet, supra; Mississippi Valley Trust Co. v. Commissioner, 8 Cir., 72 F.2d 197; Newton Trust Co. v. Commissioner, 1 Cir., 160 F.2d 175.
Contingent or conditional gifts will not qualify for the charitable deductions allowable under Section 2055 or comparable sections. There must be some degree of certainty that the charity will be benefitted and that the desired charitable purposes will be carried out. There is no such certainty in the case at bar.
Plaintiff's claim for refund is denied.
This memorandum opinion is adopted as the findings of fact and conclusions of law by the court and the clerk will enter the proper judgment in favor of the defendant.