CITY OF ST. LOUIS et al., Petitioners-
Respondents,

v.

STATE TAX COMMISSION of Missouri
et al., Defendants,
and
The Engineers' Club of St. Louis, a not-for-
profit corporation, Defendant-Appellant.

The ENGINEERS' CLUB OF ST. LOUIS,
a Missouri Corporation, Defend-
ant-Appellant,

v.

STATE TAX COMMISSION of Missouri,
Defendant.

No. 57646.

Supreme Court of Missouri,
En Banc.

July 14, 1975.

Robert C. McNicholas, Jack L. Koehr, City Counselors, James J. Wilson, Associate City Counselor, St. Louis, for petitioner-respondent City of St. Louis.

Willard B. Bunch, County Counselor, John Edward Cash, Associate County Counselor, Kansas City, for amicus curiae, Jackson County, Missouri.

Lashly, Caruthers, Thies, Rava & Hamel, Elihu M. Hyndman, William I. Rutherford, St. Louis, for defendant-appellant.

MORGAN, Judge.

This opinion is written after a recent reassignment of the case, and it presents the limited question of whether real property of The Engineers' Club of St. Louis is exempt as a charity from ad valorem taxes for the year 1970. We hold that it is.

Much of the factual recitation found in the opinion originally written follows without benefit of quotation marks.

In 1970 the assessor of the city of St. Louis assessed at the value of $230,900, real estate and improvements owned and occupied by The Engineers' Club of St. Louis (hereinafter referred to as The Engineers' Club, the Club, or the appellant). Before that year the property involved was carried on the tax books as exempt because used for charitable purposes. The Club appealed the assessment to the board of equalization of the city and, being unsuccessful there, appealed to the State Tax Commission (hereinafter the Tax Commission or the Commission), contending that the property is exempt from taxation for state, county and local purposes for the reason it is used exclusively for charitable purposes within the meaning of § 137.-100(5).[1] After a hearing, the Commission made findings of fact and conclusions of law, and entered its decision holding (1) that while the property is not wholly exempt because it is not used for charitable purposes, it is partially exempt because of its "educational activities"; (2) that "approximately 10 percent of [its] activities * * * do not fall within the educational exemption * * *, [but that] the remaining 90 percent * * * should be regarded as exempt"; and, therefore, (3) the property should be assessed at 10 percent of $230,900, or $23,090.

Both the city and the Engineers' Club filed petitions for review of this decision in the circuit court pursuant to Rule 100.-03[2] et seq., each taking the general position that the decision was contrary to or not authorized by law, the city seeking reinstatement of the original assessment and the Engineers' Club full exemption.

The circuit court ordered the two petitions consolidated for all purposes in accordance with a stipulation of the parties, and the cause was thereafter submitted on the record made before the Tax Commission, the briefs filed, and argument of counsel. In due course the court filed a memorandum opinion holding that the property was not used exclusively for charitable purposes and therefore was not exempt, and that the case should be remanded to the Tax Commission with directions to reinstate the assessment of $230,900. Judgment was entered accordingly, and the Engineers' Club has appealed.

The facts, as found by the State Tax Commission and the trial court, are, in substance, as follows. The Engineers' Club of St. Louis was organized December 2, 1868, and has remained in existence since. It is incorporated as a non-profit corporation by pro forma decree of the circuit court of the city of St. Louis. Its constitution provides in Article II:

"The Corporation shall be a non-sectarian, non-political and non-profit society. The objectives and purposes of the Corporation shall be to promote the educational and professional improvement of its members, to advance the field of engineering in its several branches, to make available to the general public technical and scientific information and knowledge, and generally to aid in the solution of public questions involving engineering and scientific prob-

---

1. References to statutes are to RSMo 1969 and V.A.M.S.

2. References to rules are to Missouri Supreme Court Rules, V.A.M.R. See also §§ 536.100–536.140, RSMo 1969.

lems. The entire income of the Corporation shall be used in the furtherance of its objectives and purposes and no part of such income shall inure to the benefit of any individual or individuals, except as compensation for services rendered or for necessary expenses actually incurred."

Membership in the Club is voluntary and open to any person of good moral character who is a registered professional engineer or a registered architect, or who is engaged in an occupation allied to the practice of engineering or architecture or science, or whose interest is in one or more of these fields. Its membership was 2,679 on May 31, 1970.

In 1926 the Club acquired one of the parcels of real estate involved in this suit and in 1956 acquired the adjoining parcel. In 1959 the present building, designated as 4359 Lindell Boulevard, was constructed on this property and has since been occupied by the Club. The real property is a tract of land having a 200 foot frontage on the north side of Lindell with a northerly depth of 213 feet. The cost of the real estate was $196,000 and the cost of the improvement $367,541. The building consists of one story and a basement. The ground floor contains an auditorium having a 400 seat capacity, a reception area, cloak room, office for clerical staff and for the club secretary, a library, pantry and serving counter, and a fellowship hall. The basement consists of a utility room, recreation rooms and a large meeting room. At the rear of the building is a parking lot. The Club has no dining room facilities or food service. Food is made available for meetings and is provided either by a catering service or by the members themselves. No facilities are available for private parties, luncheons or dinners by the individual members. The books of the Club reflect charges to others for such services as "Projectionist," "help," "refreshments," and other similar items, but all such costs are reimbursement for actual expenditures only, without profit.

The activities of the Engineers' Club are extensive. There is a program of weekly meetings, running from September through May. At these meetings there are technical programs, and a great many of them are co-sponsored by one of the local chapters of a national specialty group. Certain other societies participate, such as the American Institute of Archeology, the American Institute of Architects, or the American Institute of Aeronautics and Astronautics, among others. These meetings are held for members of the participating societies, the general public, and other engineers. One of the primary objectives of the meetings is to enable specialists in one field to become acquainted and communicate with specialists in their own and other fields. The holding of these meetings is one of the principal functions of the Club.

Another Club function is the young engineers' program: a program of meetings at which papers are presented on various topics, discussions held, and ideas exchanged. This is done entirely by junior engineers.

The Club also concerns itself with the education of engineering students. The Club sponsors meetings with Missouri University at Rolla, Columbia and St. Louis, and with St. Louis University, Washington University and Purdue University. These review curriculae, explore new avenues of teaching, and project ideas as to revision in the training of engineering students. The Club also has an education committee which works with a national organization called The Engineers Council for Professional Development which works through high schools and secondary schools all over the country. Their purposes are to explain what a career in engineering is, why it is attractive, and what training is necessary to become an engineer.

The Club building is sometimes used by private companies. An example of this use is that made of the Club's facilities by Sachs Electric Company, a private concern. That company has a seminar each year to

acquaint electricians with the city's building program requirements. Other private companies, such as White-Rodgers Company, Mallinckrodt Chemical Company, Portland Cement Association and others, use the facilities for seminars. The use of Club facilities is restricted to organizations which are concerned with technical, scientific or closely allied types of work. These meetings are open to the public. The Engineers' Club charges for the hall rental, for extra help, and such other costs as may be involved. No profit is made, however.

In addition, the Club is used for publication of "The Engineering Club Journal," for Club committee meetings during the day, for exhibits of various kinds, and for fund-raising affairs for engineering students.

There is some social activity, including one night a month called fellowship night, and bridge games are played about once a week. There are billiard tables located in the basement, and several dances are held each year.

In addition to the educational meetings and activities held by The Engineers' Club, it has taken positions on matters of public concern, including mass transportation, airport planning and water quality control. Since 1966 the board of the Club adopted various resolutions supporting matters of public interest, including bond issues for parks, courthouses, office buildings, and other public bond proposals. In 1970 the board approved the use of the Club facilities to hold a public hearing on air pollution and instructed its president to write the mayor a letter approving a vote on the 1 per cent sales tax proposition and the $15,000,000 bond issue to be submitted to the voters. It passed a resolution to urge the head of St. Louis University to reconsider the discontinuance of its engineering school and requested the Governor of Missouri to appoint members of the Club to the Governor's Council on Environment. The board also resolved that the Club take

leadership in promoting the establishment of a state-supported engineering school at the University of Missouri in St. Louis and that a committee be appointed to implement the action of the Board.

Under the direction of its Public Affairs Committee a series of public meetings were held in 1968 using the Club facilities. These meetings were conducted by a panel of speakers of national and local reputation. These included the following:

A mass transportation symposium was held in April, 1968. It was attended by approximately 140 people. Among topics discussed were mass transit in St. Louis, the national mass transit situation, financing sources for transit systems, the manner in which Pittsburgh is satisfying its mass transportation needs, and a report concerning the East-West Gateway survey of transportation requirements.

An airport-planning symposium was held in May, 1968, with 140 people in attendance representing governmental agencies, consulting engineering firms, architects, manufacturers, students and airlines. The presentation included the expected future of aviation, the vehicles that will be used in the near future, the requirements of general aviation, the facilities necessary at an airport to serve this rapidly-growing industry, the manner of financing and managing airports, and what St. Louis is currently doing to provide the best possible service for its citizens.

In November, 1968, a Water Quality for Tomorrow symposium was held and was co-sponsored by the League of Women Voters of Missouri, the University of Missouri at Columbia and the Engineers' Club. Two hundred and twenty-seven people attended, including businessmen, engineers, college professors, governmental agency personnel, union personnel, representatives of the press, legislators, League of Women Voters and other civic organizations including 26 students from Eden Theological

Seminary. The object of the symposium was to inform and interest the citizens of this area in the present use of our waters, the consequence of such use, and the public planning needed to improve water quality through the responsible governmental agencies. The role of the individual citizen was emphasized.

In April, 1969, a Solid Waste Disposal symposium was held which was intended to focus discussion of the problems of refuse collection and disposal not only for members of the Club but also for interested citizens of St. Louis. One hundred twenty people attended. Presentations were made by the Refuse Commissioner of the city of St. Louis, the Director of the Division of Air Pollution Control of St. Louis county, and the Executive Director of the Southwestern Illinois Metropolitan Area Planning Commission, and by a representative of the United States Public Health Service.

In April, 1970, a Pre-stressed Concrete Design seminar was held, sponsored by the Portland Cement Association with about 100 people in attendance at each session.

In 1963, '64, '65, '67, and '68 a series of practical instructional courses was presented at the Club under the sponsorship of the St. Louis section of the American Society of Civil Engineers. These courses covered such topics as "The Business Aspects of Engineering"; "Building Codes, Whys and Wherefores"; "Design and Construction of Multi-Story Buildings"; "Design With Computers"; "The What and Why of Soil Investigations" and "The Critical Path Methods of Work Scheduling." Approximately 100 engineers and architects attended each of these courses, with from six to twelve instructors in each course.

The Club mailed announcements of these meetings to a broad list of organizations including the Chamber of Commerce list of major employers, Mayors and Chief Engineers of all municipalities in the area, the East-West Gateway Coordinating Council mailing list, League of Women Voters, Engineers' Club mailing list and all news media.

Article X, § 6, of the 1945 Constitution of Missouri (as amended in 1972) provides, in part, that: " . . . all property, real and personal, not held for private or corporate profit and used exclusively . . . for purposes purely charitable . . . may be exempted from taxation by general law."

Section 137.100 (as amended in 1959), implementing the constitutional provision, provides, in part, that: "The following subjects are exempt from taxation for state, county or local purposes: All property, real and personal actually and regularly used exclusively . . . for purposes purely charitable and not held for private or corporate profit . . ."

The city does not contend that the property is used or held for private or corporate profit; nor does it question the fact that the Engineers' Club is a not-for-profit corporation. Its basic contention is that the property is not used exclusively for purely charitable purposes.

Although each tax exemption case is peculiarly one which must be decided on its own facts, Midwest Bible & Missionary Inst. v. Sestric, 364 Mo. 167, 260 S.W.2d 25 (1953), there are rather fixed guidelines for doing so, as established by judicial precedents. Some of the more basic ones are herewith noted.

■■■ Missouri does not follow the partial-exemption theory, and if any part of the property is used for a non-charitable purpose the whole is taxable. Evangelical Lutheran Synod, etc. v. Hoehn, 355 Mo. 257, 196 S.W.2d 134, 145 (1946), Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S.W.2d 38, 39 (1948). Tax exemption statutes are to be strictly but reasonably construed so as not to curtail the purpose and intended scope of the exemp-

tion. Bader Realty & Investment Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W.2d 489, 492 (1949). The burden is on the owner, claiming that his property is exempt, to establish that his property falls within the exempted class. National Cemetery Ass'n of Missouri v. Benson, 344 Mo. 784, 129 S.W.2d 842, 845 (1939).

The parties agree that this case, as others have, must turn on whether or not it reasonably can be concluded that the property is regularly used "exclusively" for "purposes purely charitable" as those terms have been refined by the case law of this state.

We consider the latter term first and note a portion of appellant's arguments. Attention is called to the early case of The State v. Academy of Science, 13 Mo.App. 213 (1883), wherein the court, l.c. 216, said: "A gift designed to promote the public good by the encouragement of learning, science, and the useful arts, without any particular reference to the poor, and any gift for a beneficial public purpose not contrary to any declared policy of the law, is a charity." A similar definition formed by this court in Missouri Historical Society v. Academy of Science of St. Louis, 94 Mo. 459, 8 S.W. 346, 348 (1888) is noted, and it is then acknowledged that: "There was a point at which the courts in our state undertook to withdraw to some extent from the broad early construction of the statute, State ex rel. Koeln v. St. Louis Y. M.C.A., 259 Mo. 233, 168 S.W. 589 (1914); State ex rel. St. Louis Y.M.C.A. v. Gehner, 320 Mo. 1172, 11 S.W.2d 30 (1930), and St. Louis Y.M.C.A. v. Gehner, 329 Mo. 1007, 47 S.W.2d 776 (1932); Young Women's Christian Ass'n v. Baumann, 344 Mo. 898, 130 S.W.2d 499 (1939)." It is then submitted that whether or not Missouri would take a restricted view of the words "used exclusively for charitable purposes" was set to rest by this court in Salvation Army v. Hoehn, 354 Mo. 107, 188 S.W.2d 826 (1945). Therein, the court returned to a less restrictive approach, and at l.c. 830 said:

"In the case of In re Rahn's Estate, 316 Mo. 492, loc. cit. 511, 291 S.W. 120, loc. cit. 128, 51 A.L.R. 877, the court quoted with approval from R.C.L., Secs. 2, 3, pp. 291, 294, as follows:

" 'Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. * * * A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public.' See also, Robinson et al. v. Crutcher et al., 277 Mo. 1, loc. cit. 8, 209 S.W. 104; Catron et al. v. Scarritt Collegiate Institute et al., 264 Mo. 713, loc. cit. 725, 175 S.W. 571, 573."

The definition last quoted, although expressed in various words by different writers, remains as the basic and accepted connotation to be drawn from the words— "charitable purposes"—in this state. Missouri Digest, Charities, ▮ and Note 3 of Supplementary Index to § 137.100, V.A. M.S.

There yet remains the more difficult task of considering the facts of this partic-

ular case in light of such a definition. After so doing, the trial court declared that: "The Engineers' Club, however, has failed to sustain the burden of establishing that such activities relieve society or the governmental agencies involved of any burden otherwise imposed upon them." The conclusion reached is based obviously on that part of the above quoted definition which includes the words: "or otherwise lessening the burdens of government." It would appear, as appellant suggests, that the trial court placed too restrictive and literal an interpretation on that portion of the definition. Although government provides many engineering schools, it is undoubtedly true that the Engineers' Club in question would not have been provided by any governmental unit, absent such a project by appellant. To establish a tax-exempt status, however, the property owner need not prove that the specific activity or project was one which government had a burden to provide. For instance, this court in St. Louis Council, Boy Scouts of America v. Burgess, 240 S.W.2d 684 (Mo. banc 1951), held to be tax exempt, under the charitable purposes test, 1170 acres of land owned by the St. Louis Council and used on weekends by boy scouts for nature trips and camping. No suggestion was made that the property owner had to show that its effort relieved government of a specific burden, i. e., provide a camping ground for boy scouts. To the contrary, it is only necessary that there be a clear and convincing showing that the specific activity in question does fall within an accepted category found in the definition. Of those, "education" has been explicitly and firmly established as one by the case law of this state. Had the people of Missouri or the legislature become dissatisfied with including the same within the definition of charity, they long since would have repealed the constitutional provision or amended the statute. It is of some significance that neither has taken place although, as previously noted, each recently has been amended. Education is an accepted burden of government and society, and there is no logical reason to make an exception for specialized or advanced education as distinguished from more elementary approaches. Both are essential to the preservation of our way of life in this state and nation. Furthermore, there is nothing in the constitutional exemption, the statutory implementation thereof or the case law construing the same which indicates that academic pursuits must be conducted at a level of mediocrity to qualify for the tax exemption authorized. There should not be a penalty placed on the pursuit of excellence in the engineering field —or any other, so long as the same is open to the public for its participation and benefit in an educational sense. Failure to allow the public to participate, and thus have an opportunity to benefit directly, can defeat a claimed tax-exempt status. In Frisco Employes' Hosp. Ass'n v. State Tax Comm., 381 S.W.2d 772, 779 (Mo.1964), exemption was denied because " . . . the facilities of appellant's hospital are available only to members of appellant association." Likewise, the same result was reached in Trustees of Local 88, Etc. v. State Tax Commission, 367 S.W.2d 549 (Mo.1963). The facts of the instant case are to the contrary.

Next, respondents concede that: "The appellant has offered substantial evidence of the many contributions that it makes to society in general and to the Metropolitan St. Louis Area in particular. These contributions are in the area of education, advancement of science and civic endeavors. These contributions have not been disputed and are not in issue." However, it is then asserted " . . . that the primary reason that a member of a profession joins an organization such as the Engineers' Club is to derive a benefit to himself either directly by his own participation in its activities or indirectly through the advancement of his profession." Such a contention is recognized as the *quid pro quo* argument. In

other words, it is submitted that appellant's activities are self-serving and designed to promote the personal welfare and economic advantages of its own members in the profession of engineering. This argument appears in most every case on the subject. It is answered in each instance by the facts of the particular record. For example: (1) a medical society was denied exempt-status in Hammerstein v. Kelley, 235 F. Supp. 60 (E.D.Mo.1964), affirmed at 349 F.2d 928 (8th Cir. 1965); whereas, (2) a lawyers' association was approved for exempt-status in St. Louis Union Trust Co. v. United States, 374 F.2d 427 (8th Cir. 1967). Certainly it would not be logical to contend that a member of any intelligent group, be it professional or otherwise, would not personally improve himself by participating in any type of educational activity. However, the controlling factor is the extent to which such activity is designed to benefit the public and society in general. From all of the cases cited and researched on the question, the facts of this case reflect the most consistent and dedicated effort to see that the benefit to be derived from such scholarly endeavors, in fact, would flow directly to the general public. On the facts presented, it is both reasonably and legally permissible to conclude, as we do, that the questioned property was being used primarily for a charitable purpose.

■ Next, was it so used "regularly" and "exclusively"? On this point, respondents make two contentions in addition to the *quid pro quo* argument just considered. First, it is submitted that "the use of the property for purely social activities destroys its use for exclusively charitable purposes." All of such social activities have been detailed heretofore and need not be repeated. It is sufficient to say that they were very limited and inconsequential in nature; and, in passing, it is fair to suggest that social activities, so long as they do not become the dominant factor,

would tend to make the group more enthusiastic and cohesive in carrying out the primary objective. See Cooley Taxation, 4th Ed., Vol. 2, Sec. 675, p. 1433. Second, "the rental income derived from the use of the property destroys the claim for exemption." The two cases cited on this point, Fitterer v. Crawford, 157 Mo. 51, 57 S.W. 532 (1900) and St. Louis Gospel Center v. Prose, 280 S.W.2d 827 (Mo.1955), are not comparable factually. Here, such charges were not for profit and were based on a theory of reimbursement only.

The cause is reversed and remanded with directions to enter judgment in favor of The Engineers' Club of St. Louis.

PER CURIAM:

The Division Two opinion by MORGAN, J., is adopted as the opinion of the Court en Banc.

SEILER, C. J., and MORGAN, BARDGETT, FINCH and DONNELLY, JJ., concur.

HENLEY, J., dissents in separate dissenting opinion filed.

HOLMAN, J., dissents and concurs in separate dissenting opinion of HENLEY, J.

HENLEY, Presiding Judge.

I respectfully dissent.

In Salvation Army v. Hoehn, et al., 354 Mo. 107, 188 S.W.2d 826, 830 [6] (1945), the court, en banc, held that the words "used exclusively" appearing in what is now article X, § 6, of the constitution of Missouri, and § 137.100, RSMo 1969, have reference to the primary and inherent use as distinguished from a secondary and incidental use. See also: Frisco Employes' Hospital Ass'n v. State Tax Commission, 381 S.W.2d 772, 779 (Mo.1964).

The present day concept of the words "purposes purely charitable" is expressed

in Salvation Army v. Hoehn, supra, and Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S.W.2d 38 (1949). In *Gruner*, supra, the court said (l.c. 40) that the term "charity" is not confined "solely to the relief of the destitute," but also includes "humanitarian activities * * * which are intended to improve the * * * mental * * * condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens."

The accepted definition of charity, quoted in the principal opinion, embraces not only a *gift* but also a *use* of property which bestows the benefits of education directly upon an indefinite portion of the public. Of course, not all uses of property for educational purposes may be characterized as being for purposes purely charitable. The use of property of a private organization or club of professional men for educational purposes may be characterized as charitable for purposes of tax exemption if the primary purpose of that use is for the benefit of the general public and its use by members of the club merely the means adopted to support the primary purpose. But if the primary purpose of the use is to benefit its members or a limited class of persons it may not be so characterized, even though the public will derive an incidental benefit therefrom. Massachusetts Medical Society v. Assessors of Boston, 340 Mass. 327, 164 N.E.2d 325, 328 [3] (1960).

Viewed in the light of these principles, I am of the opinion that the decision of the trial court was clearly right. As indicated, one of the uses made of its Club building by the Engineers' Club is for educational purposes during a part of the year. The programs presented at Club meetings are technical in nature and a stated objective of these programs is to enable specialists to learn to communicate with specialists in their own and allied fields. The symposiums and seminars conducted by the Club alone or with others on such subjects as mass transportation, airport planning, water quality, waste disposal and pre-stressed concrete design are no doubt educational and of benefit to members of the Club and, in general, to those other engineers and persons specializing in or otherwise associated with businesses engaged in these particular fields of engineering. Although it is said the general public is invited to these meetings, symposiums and seminars, the very nature of the programs presented would tend to discourage, and probably effectively exclude, the attendance of the public in general. Clearly, the programs are not so designed and attuned as to attract and encourage their attendance. It may not be said, in my opinion, that these uses of the Club property are primarily for the direct benefit of the public. On the contrary, its use is primarily for the benefit of Club members and others having closely allied interests, "a limited class of persons."

The education-oriented uses made of the property by the Club are praiseworthy in that their purpose is to advance the knowledge and skills of members of engineering and related professions by continuing their education. No doubt a better informed and prepared group of professionals is of benefit to the public, but in this case it is an indirect and purely incidental benefit.

For these reasons, I would hold that the uses made of this property were not exclusively for purposes purely charitable, and that it is not exempt from ad valorem taxes levied for the year 1970.